**Robert C. DAVIS, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

**No. 25736.**

United States Court of Appeals, Ninth Circuit.

May 23, 1972.

David E. Carmack, Asst. Atty. Gen. (argued), Gilbert E. Andrews, Johnnie

---

M. Walters, Asst. Attys. Gen., Lee A. Jackson, Acting Asst. Atty. Gen., Washington, D. C., Robert L. Meyer, U. S. Atty., Mason C. Lewis, Charles H. Magnuson, Asst. U. S. Attys., Los Angeles, Cal., for defendant-appellant.

Dickinson Thatcher (argued), of Clarke, Swink, Thatcher, & Leary, North Hollywood, Cal., Stanton H. Zarrow, of O'Melveny & Myers, Los Angeles, Cal., for plaintiff-appellee.

Before BARNES, BROWNING and TRASK, Circuit Judges.

TRASK, Circuit Judge:

The United States appeals from a decision of the district court adjudging the taxpayer entitled to a refund of federal estate taxes paid in the sum of $604.84, plus interest. The controversy concerns the validity of Treasury Regulation § 20.2031–8(b) (1),[1] which specifies how shares of an open-end investment company must be valued for estate tax purposes. Jurisdiction of the district court was conferred by 28 U.S.C. § 1346, and the case is properly before us under 28 U.S.C. § 1291. The opinion of the district court is reported at 306 F.Supp. 949 (C.D.Cal.1969). We affirm.

On March 29, 1965, the date of the death of Isabelle Mildred Davis, she and her husband were owners in joint tenancy of 9,518 shares of Affiliated Fund, Inc., an open-end investment company or mutual fund. Such an organization sells shares in itself and with the proceeds engages in the business of investing, reinvesting and trading in securities. It continuously sells its shares to the public and must continually offer to redeem them.[2] The selling price to the public, the "asked" or "offering" price, is the net asset value per share of the total securities owned by the company, plus a sales commission or "sales load," which is a varying percentage of the asked price depending upon the value of the number of shares purchased in a single transaction.[3] The sales load of Affiliated ranges from 2½ percent on sales of $100,000 or more to 7½ percent on sales of $5,000 or less. The price at which this Fund will redeem its shares is the net asset value.[4] Thus, if the taxpayer had purchased 9,518 shares on the market at date of death, the cost would have been $89,754.74, and would have included the sales load. Had the taxpayer asked the Fund to redeem its shares on that date, he would have received $86,233.08, the computed net asset value without sales load.[5]

The taxpayer valued the shares on the estate tax return at the amount for which they could be redeemed, $86,233.08. The Internal Revenue Service, relying on Treasury Regulation § 20.2031–8(b), which requires that shares in a mutual fund be valued for estate tax purposes at the public offering price, at $89,754.-74,[6] assessed a deficiency. It was paid and this suit filed for its recovery as an estate tax illegally assessed and collected.

1. The relevant portion of Treas.Reg. § 20.-2031–8(b) reads:

"The fair market value of a share in an open-end investment company (commonly known as a 'mutual fund') is the public offering price of a share, adjusted for any reduction in price available to the public in acquiring the number of shares being valued."

2. The duty to purchase mutual fund shares at net asset value when offered by the shareholder thereof is imposed by law. Section 22(a) (1) of the Investment Company Act of 1940, 15 U.S.C. § 80a–22(a).

3. Section 22(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a–22(b), places the outside limits on the asked price, while the minimum asked price is set by the Securities & Exchange Commission Regulations, 17 C.F.R. § 270.22c–1.

4. See note 2 supra.

5. The parties agreed that in the normal course of business the executor-taxpayer would not have sold the 9,518 shares of Affiliated Fund, Inc., or any portion thereof, except by way of sale to Affiliated Fund, Inc., at the redemption price, and that such redemption price was all that the executor-taxpayer would have obtained upon sale of the shares.

6. See note 1 supra.

No question exists as to the ownership of the shares; there is likewise no question but that under Treasury Regulation § 20.2031–8(b), value at date of death is the amount a purchaser would have to pay to Affiliated Fund, Inc., in order to acquire the shares. We must sustain this Treasury Regulation if it is reasonable and consistent with the statute under which it was promulgated. Commissioner v. South Texas Co., 333 U.S. 496, 68 S.Ct. 695, 92 L.Ed. 831 (1948).

The Internal Revenue Code of 1954, as amended, provides that the value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death. 26 U.S.C. §§ 2031, 2033. The implementing regulations under the statute define valuation in general in the classic legal formula:

> "The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Treas.Reg. § 20.2031–1(b).

The application of this traditional test ordinarily results in a single price. Once the willing buyer and the willing seller have agreed, the figure is the same for both. Here, however, there are two prices. The willing buyer, the unrestrained public at time of purchase, must pay $9.43 per share, and the willing seller, the unrestrained public at time of sale, may obtain only $9.06 per share. The Treasury Department has solved the impasse by categorically declaring that the estate of a decedent is in the position of a buyer, and the value is $9.43 per share. Treas.Reg. § 20–2031–8(b) (1).

It is difficult to rationalize this regulation with the command of the statute which requires that the value of the gross estate shall include the value of all property "to the extent of the interest therein of the decedent . . . ." 26 U.S.C. § 2033. By no stretch of the imagination does the decedent have an "interest" in the $.37 per share difference representing the sales load. He cannot make a transfer so that his tranferee may realize this amount; he cannot realize it himself either as a part of his own certificate or ,separated from it. The sales load is similar to a broker's commission charged on the purchase of stocks listed on a stock exchange. Under Treasury Regulation § 20.2031–2(b), this sales charge is not a part of the gross estate.[7]

The authorities are divided. Ruehlmann v. Commissioner, 418 F.2d 1302 (6th Cir. 1969), cert. denied, 398 U.S. 950, 90 S.Ct. 1869, 26 L.Ed.2d 290 (1970), and Howell v. United States, 414 F.2d 45 (7th Cir. 1969), hold that the regulation in question is valid. Cartwright v. United States, 457 F.2d 567 (2d Cir. 1972), Hicks v. United States, 335 F.Supp. 474 (D.Colo.1971), and the district court in this case decided that the regulation is invalid.

Ruehlmann v. Commissioner, *supra,* without critical examination of the valuation problem on an a priori basis, accepted the Tax Court's interpretation of the regulation as reasonable and consistent with the Internal Revenue Code.

Howell v. United States, *supra,* involved a gift of mutual fund shares and a challenge to the applicable gift tax regulation.[8] The court rejected the tax-

---

7. The relevant portion of Treas.Reg. § 20.2031–2(b) reads:

"If there is a market for stocks or bonds, on a stock exchange, in and over-the-counter market, or otherwise, the mean between the highest and lowest quoted selling prices on the valuation date is the fair market value per share or per bond. If there were no sales on the valuation date, but there were sales on dates within a reasonable period both before and after the valuation date, the fair market value is determined by taking a weighted avarage of the means between the highest and lowest sales on the nearest date before and the nearest date after the valuation date."

8. The gift tax regulation, Treas.Reg. § 25.-2512–6(b), is identical to the estate tax regulation, Treas.Reg. § 20.2031–8(b).

payer's argument, that the redemption price controlled because it was the only figure upon which the willing buyer (mutual fund) and the willing seller (shareholder) could agree, upon the ground that the market for redemption of mutual fund shares was not an open market. As a practical matter for determining value, however, the redemption market is the market upon which both parties agree when the shares are purchased. The mutual fund chooses to operate in such form under the law and the public buys shares in the fund fully apprised of its redemption opportunities through company prospectuses.

The court in *Howell* also considered the decision in Guggenheim v. Rasquin, 312 U.S. 254, 61 S.Ct. 507, 85 L.Ed. 813 (1941), as lending support to its position. In *Guggenheim,* the Court considered the value for gift tax purposes of a single-premium life insurance policy which was irrevocably assigned simultaneously with its issue. The cost of the policy was $852,438.50, its face value was $1,000,000 and its cash surrender value was $717,344.81. The donor's gift tax return listed the value as the cash surrender value; the Commissioner fixed it at cost. The Government prevailed, the Court pointing out that the donee not only had the right to surrender the policy, but he also had the right to receive $1,000,000 on the insured's death, plus other rights including its "investment virtues." The Court concluded:

> "[A]n important element in the value of the property is the use to which it may be put. Certainly the petitioner here did not expend $852,438.50 to make an immediate gift limited to $717,344.81. Presumptively the value of these policies at the date of the gift was the amount which the insured had expended to acquire them." 312 U.S. at 257–58, 61 S.Ct. at 509.

Had the insured died the day after issue, the policy would have matured at $1,000,000. Based on actuarial tables, its cash surrender value was considerably less. Along with this value uncertainty were other values likewise imprecise. We cannot equate the valuation of shares in a mutual fund with the necessarily abstract valuation of a single-premium life insurance policy. On any given day, the net value of the mutual fund shares may be computed exactly.

The sales load is a charge for service which is paid by the buyer at purchase and never recovered. It adds nothing to the value of the shares and does not thereafter constitute an element in computing actual worth. To apply the estate tax rate to the sales charge paid is to impose a tax on a nonexistent "interest of the decedent." The regulation which permits it, Treasury Regulation § 20.2031–8(b), is inconsistent with the Internal Revenue Code of 1954, as amended, and specifically with 26 U.S.C. § 2033.

The judgment is affirmed.

Circuit Judge BROWNING would sustain the regulation for the reasons stated in the opinions in Ruehlmann v. Commissioner, 418 F.2d 1302 (6th Cir. 1969), affirming 50 T.C. 871 (1968); and Howell v. United States, 414 F.2d 45 (7th Cir. 1969).