ESTATE OF ISABELLE M. SPARLING, DECEASED, CROCKER-CITIZENS NATIONAL BANK, TRUSTEE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1307–70, 1309–70.    Filed June 5, 1973.

*Alton G. Harmon,* for the petitioner.
*Earl Goldhammer,* for the respondent.

## OPINION

FAY, *Judge:* Respondent determined a deficiency in the Federal estate tax of petitioner as follows:

| Docket No. | Date of death | Estate tax deficiency |
|---|---|---|
| 1309-70 | 12/17/65 | $20, 173. 27 |

Respondent also determined a deficiency in the Federal gift tax and a penalty for failure to file as follows:

| Docket No. | Year | Gift tax deficiency | Sec 6651(a) penalty |
|---|---|---|---|
| 1307-70 | 1957 | $4, 643. 20 | $1, 160. 80 |

Certain concessions having been made, the issues remaining for decision are:

(1) Whether participating agreements in a mutual fund owned by decedent at her death should be valued for estate tax purposes by adding to the liquidation value, a portion of the sales load attributable to such agreements. Essentially the validity of sec. 20.2031–8(b), Estate Tax Regs., is in question.

(2) Whether the value of decedent's interest in a trust fund created in the will of her husband, and includable in her gross estate by virtue of section 2036,[1] is subject to a reduction under section 2043 for the following items:

(a) A life estate received by decedent in her husband's portion of the property transferred to the trust, valued as of the day of election to take under the will.

(b) A family allowance decedent received from her husband's estate.

(c) Joint property decedent received by virtue of her husband's death.

(d) Life insurance.

---

[1] All section references are to the Internal Revenue Code of 1954, unless otherwise indicated.

(3) Whether decedent is entitled to an estate tax credit under section 2013.

(4) Whether decedent's total contribution to the testamentary trust established in her husband's will is affected by a proration of the Federal estate tax and the State death tax imposed on her husband's estate.

(5) Whether decedent is responsible for gift tax deficiency based on her transfer of community property to a testamentary trust pursuant to her election under her husband's will.

(6) Whether decedent's failure to file a gift tax return was negligent.

All of the facts have been stipulated and are found accordingly.

Isabelle M. Sparling (sometimes hereinafter referred to as Isabelle or decedent) was born on November 3, 1887, and died testate on December 17, 1965, a resident of Orange County, Calif. The Federal estate tax return of the Estate of Isabelle M. Sparling was filed with the district director of internal revenue, Los Angeles, Calif., on March 17, 1967. An amended Federal estate tax return of the Estate of Isabelle M. Sparling was filed with the district director of internal revenue, Los Angeles, Calif., on June 30, 1967.

The will of Isabelle was admitted to probate in the Superior Court of Orange County, Santa Ana, Calif. On February 18, 1966, the Crocker-Citizens National Bank, Pasadena, Calif., the petitioner herein, was duly appointed as executor of the Estate of Isabelle M. Sparling by the Superior Court of Orange County, Calif.

Isabelle's husband, Raymond Walter Sparling (sometimes hereinafter referred to as Raymond) died testate on February 5, 1956. Raymond's will, which was executed on September 5, 1947, was duly probated in the State of California, a community property State. On May 3, 1957, a Federal estate tax return for the Estate of Raymond Walter Sparling was filed with the district director of internal revenue in Los Angeles, Calif.

A testamentary trust was provided for in Raymond's will. The corpus of this trust was to include, upon the election of Isabelle, all of the community estate.

The essence of this will provided that Isabelle was to be the principal income beneficiary of the trust during her lifetime, after which the corpus of the trust was to be divided among named beneficiaries.

The pertinent provisions of Raymond's will read as follows:

THIRD : * * * If my wife, prior to the probate of this Will, shall not have elected whether she shall take under this Will or the rights given her by Law, she shall in due course make that election. She shall in any event, however, be entitled to Probate Homestead exempt property and family allowances out of my Estate. * * *

FOURTH : My beloved wife and I have discussed the provisions herein made

for her and said children, and I believe that this instrument expresses our mutual agreement, and my desire to so provide for her and divide my estate so that she shall have the benefit of approximately one-third of the total value thereof (including certain life insurance) during her lifetime * * *

\*      \*      \*      \*      \*      \*      \*

SIXTH : I give, devise and bequeath the residue of my Estate, real and personal, wherever situated, hereinafter termed the Trust Estate to my said beloved wife, Isabelle MacLean Sparling, to my said son, Raymond Carter Sparling, my said daughter, Margaret May Sparling Kingman, my said adopted daughter, Jean Norris Sparling DeGolia, and my brother, Maurice C. Sparling, IN TRUST, to hold, manage, and distribute as follows :—

\*      \*      \*      \*      \*      \*      \*

C. I direct my said Trustees to at least annually, and preferably monthly if conveniently possible :

(a) Pay my said wife, Isabelle MacLean Sparling, an average of one thousand dollars ($1,000.00) per month from the net income of my Estate, as long as said net income is sufficient for said purpose.

\*      \*      \*      \*      \*      \*      \*

ELEVENTH : *The provisions herein made for my said wife are made in lieu of any and all other rights, including her rights to Community Property which she may have under the laws of the State of California or elsewhere (other than the Life Insurance, joint tenancy property, or Government bonds)* and as a condition precedent to receiving any portion of my Estate under this instrument she must in writing elect as to whether she will inherit under this instrument or under any and all laws in her favor. In the event she does not elect to accept the provisions made for her herein, she shall not act as a Trustee of my Trust Estate or otherwise receive any benefits under the terms of this instrument, but shall only receive such portions of the community property as she may be entitled to by law. In such event, I give, devise and bequeath all of my Estate over which I have a testamentary power to my two children, Raymond Carter Sparling and Margaret May Sparling Kingman, share and share alike and free from any and all trust provisions herein contained. [Emphasis added.]

On February 10, 1956, 5 days after Raymond's death, Isabelle elected to take in accordance with Raymond's will. She waived all claims to her share of the community property.

From February 1956 through and including December 1957 Isabelle received a family allowance totaling $23,000.

On December 23, 1957, the community property comprising the corpus of the trust created in the will of Raymond was distributed to the trustees named in Raymond's will to hold in trust.

Soon after the distribution to the trust, the trust corpus was converted into cash, and the cash was deposited in accounts in several savings and loan associations.

The total value of the community property forming the corpus of the trust created by the will of Raymond was computed at the time of the trust's creation at $253,932.31.

The value of the corpus of said trust as of December 17, 1965, the date of death of Isabelle, as well as on the alternate valuation date, was $266,166.19, comprised of the following:

| | |
|---|---:|
| Cash in savings and loan associations | $265, 000. 00 |
| Cash in checking account | 597. 45 |
| Cash in bank savings account | 1, 137. 81 |
| | 266, 735. 26 |

Less:

| | | |
|---|---:|---:|
| Accrued Federal income tax liability | $528. 96 | |
| Accrued State income tax liability | 40. 11 | 569. 07 |
| Total | | [1] 266, 166. 19 |

[1] The parties have stipulated as to certain bank accounts and accrued tax liabilities in arriving at this figure. The ultimate figure which was contested in the petition is therefore no longer at issue.

The total net value of property owned jointly by Raymond and Isabelle was $52,547.72, one-half of which was reported as taxable on the Federal estate tax return of Raymond. None of said property held jointly was made part of the corpus of the trust created in the will of Raymond.

All of said property held jointly by Raymond and Isabelle became the property of Isabelle by right of survivorship upon the death of Raymond and thence was held by her free of trust.

None of the proceeds of life insurance on the life of Raymond in the amount of $43,049.56 were made part of the corpus of the trust created in the will of Raymond. Isabelle received $30,368.28 of the proceeds of the life insurance. The remaining beneficiaries received $12,681.28.

All such proceeds distributed to Isabelle after the death of Raymond were distributed to her pursuant to the contracts of insurance and were held by her free of trust.

At his death Raymond owed debts in the amount of $4,427.68. His estate incurred funeral expenses and administration expenses of $10,868.88. California State death tax in the amount of $4,801.40 was paid by Raymond's estate.

Federal estate tax in the amount of $32,913.77 was paid by Raymond's estate.

The monthly trust income of the trust created in Raymond's will was less than $1,000 a month until 1965 when the total trust income was $12,486.51 for the year.

Upon the death of Isabelle, the trust created in the will of Raymond terminated. The corpus of that trust was thereafter distributed in equal parts to (1) Raymond Carter Sparling, son of Raymond; (2)

Margaret May Sparling Kingman, daughter of Raymond; and (3) Jean Norris Sparling DeGolia, daughter of Isabelle and adopted daughter of Raymond.

No Federal gift tax return was filed nor was any Federal gift tax paid with respect to the transfer of any remainder interest in Isabelle's share in community property.

At her death Isabelle owned participating agreements in the Insurance Securities Trust Fund (ISTF).[2]

ISTF is registered under the Federal Investment Company Act of 1940 as an open-end, diversified management company. The method of investment in ISTF is for the investor to purchase "Participating Agreements" in denominations of $1,000 or more. A sales load of 8.85 percent of the aggregate amount invested is deducted upon the purchase of a participating agreement according to the single payment plan. Following the deduction of the sales load the remaining portion of the investment is invested by ISTF. ISTF invests the funds acquired through the sale of participating agreements in common stocks of certain insurance companies, banks, and holding companies.

Each participating agreement sold by ISTF has a maturity period of 10 years from the date of sale. Upon the maturity of any participating agreement the owner thereof receives its liquidating value, which is his proportionate equity in the liquidating value of the net trust assets computed as of the maturity date and based upon the market prices of the portfolio securities as of that date. An investor in ISTF has the privilege of surrendering his agreement at any time within the 10-year

[2] Isabelle's holdings in ISTF were as follows:

| Agreement No. | Issued | Face value | Value as reported on alternate valuation date | Value as determined by respondent |
|---|---|---|---|---|
| E252717 | 2/04/63 | $15,000 | $11,390.17 | $11,674.84 |
| U280806 | 7/03/63 | 10,000 | 8,059.16 | 8,544.72 |
| U301153 | 10/17/63 | 15,000 | 11,328.69 | 12,036.87 |
| U301154 | 10/17/63 | 10,000 | 7,638.60 | 8,116.14 |
| U460747 | 9/07/65 | 15,000 | 12,601.78 | 13,611.17 |
| U344261 [1] | 4/15/64 | 6,000 | 4,276.07 | 4,464.15 |
| U344263 | 4/15/64 | 1,000 | 695.97 | 742.63 |
| U367758 | 7/13/64 | 2,500 | 1,706.03 | 1,824.30 |
| U367759 | 7/13/64 | 2,500 | 1,706.03 | 1,824.30 |
| U393527 | 10/21/64 | 2,500 | 1,740.35 | 1,865.00 |
| U393528 | 10/21/64 | 2,500 | 1,735.57 | 1,845.81 |
| U465477 | 10/07/65 | 1,000 | 820.07 | 886.37 |

[1] This participating agreement was reissued prior to the death of Isabelle as three separate agreements as follows:

| Agreement No. | Issued | Face value | Value as reported on alternate valuation date | Value as determined by respondent |
|---|---|---|---|---|
| U344909 | 4/15/64 | $2,000 | $1,402.41 | $1,496.45 |
| U344910 | 4/15/64 | 2,000 | 1,402.41 | 1,496.45 |
| U344911 | 4/15/64 | 2,000 | 1,471.25 | 1,471.25 |

maturity period. If he does so, he is entitled to the liquidation value of his agreement computed as of a time within 24 hours following the receipt of his request to surrender. A holder of ISTF funds has no market for the sale of such funds other than redemption.

The values of the participating agreements as reported on the estate tax return of the Estate of Isabelle M. Sparling were the "liquidation values" of the participating agreements as of the alternate valuation date. In determining a portion of the deficiency in the Federal estate tax, respondent added to such "liquidation value" the proportion of the "sales load" that the remaining months of the life of the agreement bore to the total life of the agreement (120 months).

There were other numerous adjustments made to Isabelle's estate tax liability. They include a greater inclusion in Isabelle's gross estate under section 2036, and the disallowance of a credit claimed under section 2013. These adjustments served to increase the amount due for Federal estate taxes.

Respondent also asserted a gift tax deficiency and a penalty which reflected Isabelle's failure to file any gift tax return when she transferred her remainder interest to the testamentary trust established in Raymond's will.

The primary issue in this case is now a settled point of law. See *United States* v. *Cartwright*, 411 U.S. 546 (1973).[3]

The Supreme Court has found that the respondent's regulation, sec. 20.2031–8(b), Estate Tax Regs.,[4] governing the valuation of mutual funds for estate tax purposes is unreasonable and inconsistent with the

---

[3] See also *Davis* v. *United States,* 460 F. 2d 769 (C.A. 9, 1972), affirming 306 F.Supp. 949 (C.D. Cal. 1969).

[4] Sec. 20.2031–8   Valuation of certain life insurance and annuity contracts; valuation of shares in an open-end investment company.

(b) *Valuation of shares in an open-end investment company.* (1) The fair market value of a share in an open-end investment company (commonly known as a "mutual fund") is the public offering price of a share, adjusted for any reduction in price available to the public in acquiring the number of shares being valued. In the absence of an affirmative showing of the public offering price in effect at the time of death, the last public offering price quoted by the company for the date of death shall be presumed to be the applicable public offering price. If the alternate valuation under section 2032 is elected, the last public offering price quoted by the company for the alternate valuation date shall be the applicable public offering price. If there is no public offering price quoted by the company for the applicable valuation date (e.g., the valuation date is a Saturday, Sunday, or holiday), the fair market value of the mutual fund share is the last public offering price quoted by the company for the first day preceding the applicable valuation date for which there is a quotation, adjusted for any reduction in price available to the public in acquiring the number of shares being valued. In any case where a dividend is declared on a share in an open-end investment company before the decedent's death but payable to shareholders of record on a date after his death and the share is selling "ex-dividend" on the date of the decedent's death, the amount of the dividend is added to the ex-dividend quotation in determining the fair market value of the share as of the date of the decedent's death. As used in this paragraph, the term "open-end investment company" includes only a company which on the applicable valuation date was engaged in offering its shares to the public in the capacity of an open-end investment company.

(2) The provisions of this paragraph shall apply with respect to estates of decedents dying after October 10, 1963.

statute. That being the case we conclude petitioner's method of valuation in the case at bar is correct.

The next question we must face is the extent to which the interaction of sections 2036 and 2043 will cause an inclusion of property in decedent's gross estate.

Section 2036 requires the inclusion of property in a decedent's gross estate when the decedent has made an inter vivos transfer by trust or otherwise of any interests in that property and has retained for his life the right to the income therefrom. An exception is provided for transfers made for adequate and full consideration in money or money's worth.

Stated simply, the purpose of the section is to impose an estate tax with respect to property which a decedent transferred during his life but in which he retained the right to economic benefit until his death. [*Estate of Dora N. Marshall*, 51 T.C. 696, 699 (1969), citing *First National Bank of Shreveport* v. *United States*, 342 F. 2d 415, 416–417 (C.A. 5, 1965).]

The function of section 2043 [5] is to determine the amount includable in decedent's estate when a transfer described in sections 2035 to 2038, inclusive, and section 2041 is made for inadequate consideration. That section provides that if property has been so transferred the value of the transferred property otherwise includable in the decedent's estate at decedent's deaths shall be reduced by the consideration that was received at the time of the transfer. See *Estate of Lillian B. Gregory*, 39 T.C. 1012, 1019 (1963); *United States* v. *Righter*, 400 F. 2d 344 (C.A. 8, 1968); *Estate of Daisy F. Christ*, 54 T.C. 493, 545 (1970), on appeal (C.A. 9, Jan. 11, 1971); *Estate of Dora N. Marshall*, *supra* at 703; sec. 20.2043–1(a), Estate Tax Regs.

Isabelle's election under the will to transfer her community interest to the Raymond Sparling trust in exchange for a life interest in that trust brings into play both sections 2036 and 2043.

Petitioner in the case at bar has offered many theories in support of its contention that the consideration received by the decedent has been undervalued by respondent for purposes of section 2043. Before directing our attention to these various arguments, it is important to review the exact effect of sections 2036 and 2043 in the present case.

The situation herein is not unlike that of the decedent in *Estate of Lillian B. Gregory*, *supra*, and *Estate of Daisy F. Christ*, *supra*. See also *United States* v. *Past*, 347 F. 2d 7 (C.A. 9, 1965). In the *Gregory*

---

[5] SEC. 2043. TRANSFERS FOR INSUFFICIENT CONSIDERATION.

(a) IN GENERAL.—If any one of the transfers, trusts, interests, rights, or powers enumerated and described in sections 2035 to 2038, inclusive, and section 2041 is made, created, exercised, or relinquished for a consideration in money or money's worth, but is not a bona fide sale for an adequate and full consideration in money or money's worth, there shall be included in the gross estate only the excess of the fair market value at the time of death of the property otherwise to be included on account of such transaction, over the value of the consideration received therefor by the decedent.

case the decedent elected to transfer her interest in community property to a testamentary trust. Decedent was then entitled to a life estate in the entire trust, while the remainder interest passed pursuant to the terms of the trust. For purposes of estate taxation the Court in *Estate of Lillian B. Gregory*, *supra* at 1016, correctly viewed the transaction as follows:

Under the applicable California law, [decedent] had a vested right to one-half [subject to adjustments] of the relevant community property free of any power of testamentary disposition by [the husband]. Sec. 161(a), Cal. Civ. Code; sec. 201, Cal. Prob. Code. * * * For all material present purposes, [decedent] owned her share of community property outright. She transferred said property to a trust which also consisted of [her husband's] portion of the community property. She received the right to income from the entire corpus of said trust for her life. * * *

The Court viewed the conveyance as a transfer of the decedent's property with a retained life estate, within the purview of section 2036(a)(1). It then proceeded for purposes of section 2043 to determine the extent of the consideration received for this transfer. Citing *Helvering* v. *Bullard*, 303 U.S. 297 (1938), the Court determined that the retained life estate in the property initially owned by the decedent was clearly not consideration for the transfer of such property. "It is clear that retention of a life estate in one's own property cannot be consideration for a transfer. *Estate of Lillian B. Gregory*, *supra* at 1017; see also *Estate of Dora N. Marshall*, *supra* at 703. The Court did determine however that the transferor received consideration in the form of her right to a "life estate in the portion of the trust corpus which her predeceased husband contributed." *Estate of Lillian B. Gregory*, *supra* at 1017.[6]

The Court then valued the life estate in the husband's share of the community and pursuant to section 2043 reduced the value of the transferred property includable in the decedent's estate.

The first of petitioner's arguments in the present case is directed at respondent's method of valuing the life estate which Isabelle received as consideration. The respondent, in arriving at the value of the consideration, multiplied the total value of the trust corpus at the time of its creation ($253,932.31) by the portion of the trust contributed by Raymond (.425738). This product was then multiplied by .27370, the life estate factor at age 70 (Isabelle's age at the time of the final distribution to the trust). See table I, sec. 20.2031–7(f), Estate Tax Regs. Petitioner's claim is that the correct life estate factor should be .29750, the factor for a 68-year-old woman since Isabelle was 68 when Raymond died (February 5, 1956) and when she elected to

---

[6] Indeed, it was stated in [decedent's] estate tax return that: "Our decedent exchanged her community share in return for a life interest in her husband's community." *Estate of Lillian B. Gregory*, 39 T.C. 1012, 1017 (1963).

take under the will (February 10, 1956). Petitioner claims that either of these two dates more clearly reflects the time when the transfer to the trust was accomplished for purposes of section 2043.

This question of which is the proper time in the above situation to value the life estate for purposes of section 2043 has been alluded to in many cases but never dealt with specifically. Apparently it has never been directly contested by either party.

To determine the value of the consideration received at the time of transfer it is appropriate to resort to State law to determine the extent of Isabelle's property rights and the effect of the widow's election on the exact date of transfer. "In all instances, the effect of the election is determined by the status of the property under the laws of the state." *Commissioner* v. *Siegel*, 250 F. 2d 339, 344 (C.A. 9, 1957), affirming 26 T.C. 743 (1956); see also *Estate of Emma Bressani*, 45 T.C. 373 (1966).

The case of *Estate of Daisy F. Christ, supra,* is a case in which the wife elected to take under the will. In that case the decedent's husband died on April 16, 1952, and under an agreement attached to and made a part of the will, the decedent elected to waive her rights to her share of the community property in exchange for a life estate in a testamentary trust consisting of all the community property. The husband died on April 16, 1952, but final distribution to the trust was not made until September 30, 1953. The Court was not faced with the problem of valuing the life estate for purposes of section 2043 for the parties agreed that the effective date of the transfer to the trust was September 30, 1953, the date of final distribution to the trust. The following language in that case at page 502 is pertinent:

Daisy executed her agreement to have her share of the community property pass under her husband's will in 1945 at approximately the same time that Andrew executed his probated will. However *the parties are agreed that under California law, Daisy was not bound by her agreement attached to Andrew's will before the date of the decree of distribution; and the parties are agreed that Daisy could have elected at any time before the decree of distribution on September 30, 1953, to take her share of the community property to which she was indefeasibly entitled upon her husband's death, irrespective of Andrew's will and her agreement attached thereto. * * *
[Emphasis added.]

We are not bound by the parties' interpretation of the law as agreed upon in the *Christ* case.[7] However, the effect of California State law

---

[7] Indeed, it is questionable in the circumstances of that particular case whether the agreement was based on a sound interpretation of California law. See, for example, *In Re Wyss' Estate*, 112 Cal.App. 487, 297 Pac. 100 (4th Dist. Ct. App. 1931). In that case it was held that when the wife executes her election *simultaneously* with the execution of the husband's will, as was done in *Estate of Daisy F. Christ*, 54 T.C. 493, 545 (1970), on appeal (C.A. 9, Jan. 11, 1971), the wife is irrevocably bound by that will at the husband's death. Under such circumstances the transfer would therefore be effective as of the time of the husband's death, and not as of the day of distribution.

340

on the facts of the present case would achieve a similar result as that agreed upon in the *Christ* case. That result is to make the date of transfer the day of actual distribution to the trust as was done by the respondent.

The date of death or date of election cannot possibly be considered the final date of the transfer of the assets to the trust if Isabelle could have revoked that election anytime prior to the actual date of distribution to the trust. In the case of *In Re Dunphy's Estate*, 147 Cal. 95, 81 Pac. 315 (1905), decedent left a will which required his wife to elect as to her community property rights or the benefits of the will. The widow did file a written statement claiming one-half of the estate as community property. The lower court did not find by this action that the widow had finally elected not to take under the will and held that she had until the time of distribution to make her final election. The California Supreme Court in upholding the lower court stated at page 319:

the only question here involved is whether or not the court should have found that the wife had finally and conclusively elected not to take under the will, and should have entered a decree to that effect, which would have been final and binding forever upon her and her successors in interest; but we do not think that the court erred in not so finding and decreeing. There is no provision in the will as to the time when the widow shall make her election, and there is no provision in the laws of this state that we know of prescribing any time within which such an election must be made. Of course, a final decree of distribution would be conclusive on the subject, *but clearly, so far as any mere limitation of time is concerned, the election may be made at any time before such decree, unless the party shall have have done some act to which all the elements of an estoppel apply. In the case at bar the only act done by the widow which is relied on as precluding her from making her election before distribution is her said written statement that she intends to assert her rights in the property as community property. * * * we think that the court was right in not forever precluding her from changing her mind if after further investigation and knowledge on the subject she should find it to be clearly her interest to do so. * * ** as courts should always be careful to guard the interests of widows in the estates of their deceased husbands, she should not be rigidly bound by her first impressions as to what course would be advantageous to her. And there is here no principle of estoppel involved, the objection being the mere technical one that she should be inexorably bound by a statement which has not caused any other person to do anything detrimental to his interest. * * * [Emphasis added.]

See also *In Re Cecala's Estate*, 104 Cal.App.2d 526, 232 P.2d 48 (1st Dist. Ct. App. 1951); *In Re Kelley's Estate*, 122 Cal.App.2d 42, 264 P.2d 210 (2d Dist. Ct. App. 1953).

There is no evidence of record to support a conclusion that Isabelle's election was binding at the time it was made.

Petitioner in support of its position relies on the following authorities: *Estate of Lillian B. Gregory, supra; Commissioner v. Chase*

*Manhattan Bank*, 259 F. 2d 231 (C.A. 5, 1958), reversing sub nom. *Chase National Bank*, 25 T.C. 617 (1955); Rev. Rul. 69–346, 1969–1 C.B. 227. All are distinguishable.[8]

In Rev. Rul. 69–346, *supra*, it is asserted that in the State of Washington the effective date of a gift, under an agreement whereby a wife agrees to transfer her community interest in her husband's estate to a testamentary trust for her benefit when his estate is settled, is the date of her husband's death. The basis for this ruling is the fact that the surviving spouse executed her election simultaneously with the execution of the decedent's will, prior to the decedent's death. Under such circumstances the agreement entered into prior to death is an enforceable contract, which contract becomes completely executed when one of the parties to the contract dies. *In Re Wittman's Estate*, 58 Wash.2d. 841, 365 P. 2d 17 (1961). The law in the State of California is similar. See *Estate of Emma Bressani, supra*, and *In Re Wyss' Estate*, 112 Cal.App. 487, 297 Pac. 100 (4th Dist. Ct. App. 1931). The situation in the present case is readily distinguishable from the circumstances in the revenue ruling and the *Gregory* case. [9] In the present case the surviving spouse did not execute a simultaneous election with the execution of the decedent's will. Isabelle was not put to her election until after the death of the decedent and the rule as stated in *In Re Dunphy's Estate, supra*, is therefore operative.

Petitioner's reliance on *Chase Manhattan Bank* is also misplaced. In that case the value of the widow's life interest was computed as of the husband's date of death. However, in *Chase Manhattan Bank* the widow began receiving benefits from the testamentary trust from

---

[8] Neither party has referred to *Vardell's Estate* v. *Commissioner*, 307 F.2d 688, 693 (C.A. 5, 1962), reversing on another issue 35 T.C. 50 (1960). In that case the precise time for valuation was uncontested. In somewhat similar circumstances as the case at bar, the Tax Court and the Court of Appeals held that the date of election was the proper date to value the decedent's right to receive the income during her life from the share of the community assets attributable to her husband. Pertinent language appearing at p. 693 states:

"Having determined that there is consideration as contemplated by § 2043(a), we come to the method and possibility of computation. The Regulation, § 20.2043–1, provides that the consideration must be reducible to a money value. *And the consideration received is to be valued at the time of the transfer, i.e., the date of election.* Ithaca Trust Company v. United States, 1929, 279 U.S. 151 * * * [Emphasis added.]"

This language is in direct conflict with the conclusion we have reached. However, the main issue in consideration was the applicability of sec. 2043 and not the timing of the transfer. In fact, the case cited as authority, *Ithaca Trust Co. v. United States*, 279 U.S. 151 (1929), merely holds that in determining the value of a life estate, if the choice lies between actuarial valuation at the time of transfer or actual valuation which is gained by hindsight, the courts must choose the former. Thus, we do not believe that *Vardell's Estate* decides the issue now before us. To the extent that its language may be considered inconsistent with our disposition of the instant case, we respectfully decline to follow it.

[9] In the *Gregory* case the life estate factor of the widow, computed as of the date of death of her husband, was used to determine the value of the life estate she received in her husband's share of the community property. However, in that case, as in the underlying facts upon which the revenue ruling is based, the widow made her election at the time the husband's will was executed.

the date of the husband's death. This action is consistent with the election and under the rule as expressed in *Dunphy's Estate*, the election could not have been revoked after the wife accepted such benefits. In the case at bar, Isabelle did not receive benefits from the trust until the date of distribution.[10] The mere acceptance of the statutorily awarded family allowance benefits by Isabelle is not determinative that her election to take under the will is binding. See *In Re Boyd's Estate*, 212 P. 2d. 17 (2d Dist. Ct. App. 1950).

Petitioner further disputes respondent's valuation of the consideration received for purposes of section 2043. Petitioner cites the following passages from Raymond's will:

THIRD: * * * If my wife, prior to the probate of this Will, shall not have elected whether she shall take under this Will or the rights given her by Law, she shall in due course make that election. She shall in any event, however, be entitled to Probate Homestead exempt property and family allowances out of my Estate. * * *

FOURTH: My beloved wife and I have discussed the provisions herein made for her and said children, and I believe that this instrument expresses our mutual agreement, and my desire to so provide for her and divide my estate so that she shall have the benefit of approximately one-third of the total value thereof (including certain life insurance) during her lifetime * * *

Petitioner refers to provision Third of the will and claims that one-half of the family allowance, Raymond's share, or $11,500, was consideration for Isabelle's election to take under the will because it was provided for in Raymond's will.

Petitioner refers to provision Fourth of the will and argues as follows: The overall "mutually agreed" upon plan, if Isabelle elected to take under the will, was to provide Isabelle with at least one-third of Raymond's estate. Therefore this one-third must also be consideration for Isabelle's election to take under the will and relinquish her community property. The only way to reach the one-third figure is to consider the following items as consideration received by Isabelle for her election:

| | |
|---|---:|
| Life estate in Raymond's property [1] | $29,589.33 |
| Life insurance | 30,368.28 |
| Properties held in joint tenancy [2] | 52,547.72 |
| | 112,505.33 |

[1] The exact amount of this figure is, of course, dependent on our disposition of the previous issue.

[2] Included in this is the homestead exempt property which Isabelle is entitled to by statute.

[10] This same reasoning is applicable to distinguish *Commissioner* v. *Siegel*, 250 F.2d 339 (C.A. 9, 1957), affirming 26 T.C. 743 (1956), in which the widow started receiving benefits from the trust from the date of her election. *Siegel* relied on *Chase Manhattan Bank*, 259 F. 2d 231 (C.A. 5, 1958), reversing sub nom. *Chase National Bank*, 25 T.C. 617 (1955). See also *Zillah Mae Turman*, 35 T.C. 1123 (1961).

Since the value of Raymond's total estate as claimed by petitioner, before taxes and family allowance, was $314,647.48,[11] the $112,505.33 as shown by petitioner's calculations would amount to approximately one-third of the distributed property. Petitioner therefore claims that Raymond's one-half of the life insurance and the joint property is consideration for Isabelle's election.

This novel argument of petitioner is without substance. All of the items—the family allowance, the life insurance, and the jointly held properties—would have gone to Isabelle whether she elected to take under the will or insisted upon her community property rights. When Isabelle made her election these properties already belonged to her. It is therefore impossible for purposes of section 2043 to consider any of these items as consideration received by Isabelle for her election.

A consideration, in the legal sense of the word, is some right, interest, benefit, or advantage conferred upon the promisor, to which he is otherwise not lawfully entitled, * * * [*Cuneo Press* v. *Claybourn Corporation*, 90 F. 2d 233, 236 (C.A. 7, 1937).]

First, we consider the family allowance. The rights of the widow to apply for and receive a family allowance are specifically conferred by statute. Raymond's estate was therefore at all times under a duty to provide this item, and the family allowance is not consideration for Isabelle's election.

Under California law a widow is entitled to a reasonable allowance out of her deceased husband's estate for her maintenance during the progress of the settlement of the estate and which allowance, in the discretion of the court may take effect from the date of death. * * * The right to a widow's allowance is purely statutory. [*Jackson* v. *United States*, 317 F. 2d 821, 824–825, affd. 376 U.S. 503 (1964).]

See also *In Re Secord's Estate*, 192 P. 2d 81 (1st Dist. Ct. App. 1948); *In Re Ettlinger's Estate*, 56 Cal. App. 2d 603, 132 P. 2d 895 (1st Dist. Ct. App. 1943).

In the *Christ* case at page 545, the parties never argued the point at issue here; however, the following comment made by the Court regarding any possible use of such an argument is pertinent:

It should be noted, however, that a family allowance, homestead rights, and any other rights in Andrew's estate to which the widow was entitled under California law, which she would have received even in the absence of an election to act in accordance with Andrew's will, were not part of the consideration received by Daisy in exchange for the transfer to the trust of the remainder interest in her share of the community.

Next we consider the joint property received by Isabelle. According to California State law, Raymond's estate never had any right to this joint tenancy.

---

[11] This figure, which was found in the petition only, has not been justified by petitioner.

"Survivorship is one of the incidents of joint tenancy, and *unless the estate as terminated before the death of a joint tenant, the executor of the decedent has no interest in the property.*" [quoting *In Re Zaring's Estate*, 93 Cal. App. 2d 577, 579, 209 P. 2d 642, 644 (2d Dist. Ct. App. 1949)] * * * upon the death of the joint tenant, the survivor "becomes the sole owner of the entirety, not by descent, but by survivorship, and in virture of the original grant creating the tenancy." 7 Cal. Jur. 334, sec. 4 [*King* v. *King*, 236 P. 2d 912, 913 (2d Dist. Ct. App. 1951). Emphasis added.]

Surely petitioner does not claim that Isabelle received as consideration property which she was already entitled to. The same argument applies to the life insurance. This item also belonged to Isabelle regardless of her election. Once Raymond died, Isabelle, as beneficiary under the policy, was entitled to the proceeds. The proceeds never became a part of Raymond's estate and the estate certainly could not transfer these rights as consideration for Isabelle's election.

It is well settled that a beneficiary under an insurance policy takes by virtue of the contract of insurance rather than by the law of succession ; that the proceeds do not become a part of the estate of the insured ; * * *

The gift becomes complete upon the death of the insured if not revoked. * * * [*In Re Welfer*, 242 P. 2d 655, 656 (2d Dist. Ct. App. 1952).]

See also *Cook* v. *Cook*, 17 Cal. 2d 639, 111 P. 2d 322, 327 (1941).

Petitioner relies on *Commissioner* v. *Siegel, supra,* in its contention that all of the above items should be additional consideration to Isabelle. This reliance is misplaced. In that case a specific bequest of $35,000 by the decedent husband to the widow was allowed as consideration for her election to take under the will. However, if the widow did not elect to take under the will in that case she would not have received the $35,000 bequest. This is not the situation in the case at bar where regardless of whether Isabelle decided to take under the will or not she would have received the items in question.

The next issue we must deal with is the effect of section 2013 on Isabelle's estate tax liability. Section 2013 provides for a tax credit for all or a part of the Federal estate tax paid with respect to property transferred to the decedent by or from a person who died 10 years before or within 2 years after the decedent's death. It is not disputed that Raymond died on February 5, 1956, and that the life estate which Isabelle received in his community property ($29,589.33) was property transferred within the terms of section 2013. Therefore, the general rule of section 2013(a) would be applicable but for the limitation possibly imposed by section 2013(d). Section 2013(d) in pertinent part provides :

SEC. 2013.   CREDIT FOR TAX ON PRIOR TRANSFERS.

(d) VALUATION OF PROPERTY TRANSFERRED.—The value of property transferred to the decedent shall be the value used for the purpose of determining the Federal estate tax liability of the estate of the transferor but—

*     *     *     *     *     *     *

(2) where such property is encumbered in any manner, or where the decedent incurs any obligation imposed by the transferor with respect to such property, such encumbrance or obligation shall be taken into account in the same manner as if the amount of a gift to the decedent of such property was being determined; * * *

Relying on this section respondent argues that even though Isabelle received a life estate in Raymond's share of the community property valued at $29,589.33, she is not entitled to a credit for estate taxes paid by Raymond's estate on this amount because she was required to relinquish her remainder interest in her share of the community property. Since this remainder interest is valued at $105,911.78 [12] and its relinquishment was an "obligation" imposed by the transfer, the valuation of the property subject to the credit is reduced to zero. ($29,589.33 minus $105,911.78). Respondent points to an example in the regulations in support of his contention.[13]

Petitioner argues for the application of section 2013 on the value of the life estate without reduction for the obligation referred to by respondent.

Our attention has not been called to, nor have we found, any cases which may be said to be dispositive of the issue herein. Therefore, in construing the application of section 2013 to the present case we must examine the purpose behind that section and fit our factual situation to that purpose. "The fundamental canon of statutory construction is that courts should ascertain and give effect to the intent of the legislative body." *Rodenbough* v. *United States*, 25 F. 2d 13 (C.A. 3, 1928).

The purpose of section 2013 was essentially "to avoid the hardship and the inequity of double taxation." [14] *Rodenbough* v. *United States*, *supra* at 15. See also *Cary* v. *United States*, 22 F. 2d 298, 299 (W.D. N.Y. 1927).

In order to effectuate this purpose, while at the same time preventing serious abuses of the credit, Congress provided essentially that the credit be computed on the net gain to the second estate. See *Thomas* v.

[12] This figure was determined by computing the remainder interest of a woman at age 70 in the total amount of property contributed by Isabelle to the trust.

[13] Sec. 20.2013-4 Valuation of property transferred.

(b)(3)·(iii) *Example (3)*. The transferor bequeathed certain property to his wife, the decedent, in lieu of her interest in property held by them as community property under the law of the State of their residence. The wife elected to relinquish her community property interest and to take the bequest. The value of the property transferred to the decedent is the value of the property reduced by the value of the community property interest relinquished by the wife.

[14] Sec. 2013 replaced sec. 812(c) of the 1939 Code. That section provided for a deduction from the decedent's estate of the value of property included in his gross estate which was previously subjected to gift or estate tax. Sec. 2013 provides a credit in lieu of a deduction. See generally H.Rept. No. 767, 65th Cong., 2d Sess., 1939–1 C.B. (Part 2) 102; S.Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong. 2d Sess., pp. 463–467 (1954); H.Rept. No. 1337, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., pp. A309–A313 (1954).

*Earnest*, 161 F.2d 845, 847 (C.A. 5, 1947). This is accomplished by reducing the amount subject to the credit by the various items found in section 2013(d).

In order to determine the appropriate section 2013 credit, we must reduce the value of the previously taxed property received by the transferee (Isabelle) by the value of any property which the transferee was obligated to transfer out of her estate in order to receive that property.

It follows logically that if the obligation which the transferee incurred did not reduce the amount included in her estate for estate tax purposes, such an obligation should not reduce the value of the property transferred to that estate which is subject to the credit under section 2013. This is precisely why we must allow the petitioner the claimed credit under section 2013 and prevent the inequity of a double taxation on the same item.

Isabelle transferred an interest in her community property for the life estate in Raymond's property. However, because she retained a life estate in the portion she transferred, section 2036 includes that transferred property in her estate for estate tax purposes. Therefore, Isabelle's estate for estate tax purposes received a net transfer from Raymond's previously taxed estate of $29,589.33 which was not reduced by any obligation as contemplated by section 2013(d)(2). The example in the regulations relied on by respondent is readily distinguishable. That example does not account for a transfer of community property subject to a retained interest that would bring into effect section 2036. The example states that the wife relinquished her community property interest to take a bequest. However, when the effect of section 2036 is to include that very same property in the wife's estate we cannot say that for purposes of the credit that she has properly relinquished her interest.

Petitioner also objects to the method used by respondent to calculate Isabelle's share of the community property contributed to the testamentary trust established by Raymond's will. We must agree with respondent's calculations. Respondent determined that prior to deducting expenses and claims Raymond and Isabelle each contributed $164,972.02 of community property to the trust. From this amount respondent deducted from each party's contributions one-half of the cost of the funeral and administration expenses, debts, and the family allowance. However, the respondent did not apportion at all the State death tax or the Federal estate tax. This was deducted entirely from Raymond's contribution to the trust. The effect of this was to calculate that Isabelle contributed more percentagewise to the trust than Raymond and this

in turn caused Isabelle to include a greater amount in her estate by virtue of section 2036.[15]

Petitioner contends that since a portion of Raymond's gross estate for tax purposes included joint property and life insurance which Isabelle and others received, it would be proper according to California State law [16] to apportion the taxes related to these items. The effect of such an apportionment would be to increase the after-tax net amount contributed by Raymond to the trust and decrease Isabelle's net contribution, thereby reducing the percentage of the trust attributable to Isabelle and reducing the amount of the trust includable in Isabelle's estate by virtue of section 2036.

[15] Property contributed by Raymond and Isabelle to testamentary trust at time of its creation (per estate tax return of Raymond):

| Type of property | Full value | Raymond's interest | Isabelle's interest |
|---|---|---|---|
| Real estate | $5,500.00 | $2,750.00 | $2,750.00 |
| Stocks and bonds | 35,000.00 | 17,500.00 | 17,500.00 |
| Mortgages, notes, and cash | 282,149.22 | 141,074.61 | 141,074.61 |
| Miscellaneous | 7,294.82 | 3,647.41 | 3,647.41 |
| Subtotal | 329,944.04 | 164,972.02 | 164,972.02 |

Less expenses and claims:

| Type of expense | Full amount | Raymond's share | Isabelle's share |
|---|---|---|---|
| Funeral and administration | $9,868.88 | $4,934.44 | $4,934.44 |
| Debts | 4,427.68 | 2,213.84 | 2,213.84 |
| Attorneys fees | 1,000.00 | 500.00 | 500.00 |
| Family allowance | 23,000.00 | 11,500.00 | 11,500.00 |
| State death tax | 4,801.40 | 4,801.40 | 0 |
| Federal estate tax | 32,913.77 | 32,913.77 | 0 |
| Subtotal | 76,011.73 | 56,863.45 | 19,148.28 |

Net contribution to trust:

| | *Full contribution* | *Raymond's contribution* | *Isabelle's contribution* |
|---|---|---|---|
| | $253,932.31 | $108,108.57 | $145,823.74 |
| | 100.00% | 42.5738% | 57.4262% |

[16] Cal. Prob. Code sec. 970 (West 1956):

Sec. 970. Proration; persons interested in estate; exceptions

Whenever it appears upon any accounting, or in any appropriate action or proceeding, that an executor, administrator, trustee or other fiduciary has paid an estate tax to the Federal Government under the provisions of any Federal estate tax law, now existing or hereafter enacted, upon or with respect to any property required to be included in the gross estate of a decedent under the provisions of any such law, the amount of the tax so paid, except in a case where a testator otherwise directs in his will, and except in a case where by written instrument executed inter vivos direction is given for apportionment within the fund of taxes assessed upon the specific fund dealt with in such inter vivos instrument, shall be equitably prorated among the persons interested in the estate to whom such property is or may be transferred or to whom any benefits accrues. (Added Stats. 1943, c. 894, p. 2740, § 1.)

We cannot agree with petitioner. We note that the taxes were attributable to property which Isabelle received outright and which she did not contribute to the trust. All that Isabelle contributed to the trust was her community property and it is well established that Isabelle's share of the community property was not part of Raymond's gross estate and cannot share the Federal estate tax burden. See *In Re Buckhantz' Estate*, 120 Cal. App. 2d 92, 260 P. 2d 794 (2d Dist. Ct. App. 1953). If we were to make the apportionment desired by petitioner the actual effect would be to use taxes attributable to property that was not contributed to the trust to reduce the amount of property that actually was contributed. We in effect would be allocating a portion of the taxes to Isabelle's community property and reducing her community property contribution to the trust by an equivalent amount. This effect would contravene California State law.

In docket No. 1307–70 respondent asserted a gift tax deficiency of $4,643.20, and a delinquency penalty under section 6651(a) of $1,160.80. Both the tax and the penalty are properly asserted.

On the date of the distribution to the trust, December 23, 1957, Isabelle transferred her interest in the community property to the trust. She retained a life interest in her share of the community property and received a life interest in her husband's property. As stated in the previous portion of the opinion dealing with Isabelle's estate tax liability, the life interest in Raymond's property was the only consideration she received for this transfer.

Based on the foregoing transaction it was stipulated that Isabelle on the date of transfer relinquished all power to devise or bequeath the remainder interest in her share of the community property. The value of this remainder interest on December 23, 1957, the date of distribution to the trust, was $105,911.78.[17] Isabelle contributed $145,823.74 to the trust and the remainder factor for a woman her age is .72630. See sec. 20.2031–7(f), table I, Estate Tax Regs. Respondent in accordance with section 2512(b)[18] then substracted $29,589.33, the value of the life interest in Raymond's property, which was consideration received for Isabelle's transfer. The difference of $76,322.46 [19] was correctly determined to be a gift made by Isabelle on December 23, 1957. This is the accepted method of calculating gifts which result from a widow's election to take according to the will in community property States. See *Commissioner* v. *Siegel, supra; Commissioner* v. *Chase Manhattan Bank, supra; Zillah Mae Turman,* 35 T.C. 1123 (1961).

---

[17] See fn. 22 *infra.*

[18] SEC. 2512. VALUATION OF GIFTS.

(b) Where property is transferred for less than an adequate and full consideration in honey or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift, and shall be included in computing the amount of gifts made during the calendar year.

[19] There is an unexplained discrepancy of 1 cent.

In calculating the gift tax due, respondent correctly determined that petitioner was not entitled to claim any annual exclusions as provided in section 2503 with respect to the gift of the remainder interest. The remainder interest is a future interest and where the right to take a gift is one of a "future interest" this deprives the taxpayer of the exclusion allowed by section 2503.[20] See *Fisher* v. *Commissioner*, 132 F.2d 383 (C.A. 9, 1942), affirming 45 B.T.A. 958 (1941); also see *United States* v. *Pelzer*, 312 U.S. 399 (1941).

Respondent was also correct in asserting a penalty under section 6651(a) for Isabelle's failure to file a gift tax return for the year in question. Petitioner presented no evidence to explain this failure and argued on brief that there was reasonable cause in that the case of *Commissioner* v. *Siegel, supra*, was not promulgated until November 6, 1957. Petitioner argues that this case would have apprised Isabelle of her gift tax responsibilities but, since that decision was not rendered until after Raymond's death, Isabelle could not have been aware of any gift tax responsibilities. This argument does not justify a finding of reasonable cause for Isabelle's failure to file. Petitioner in effect claims no more than mistake as to or ignorance of the law. This argument is inconclusive on two grounds. First, it is well established that ignorance of the law does not amount to reasonable cause for purposes of this statute. See *Walter M. Joyce*, 25 T.C. 13 (1955); *Eleanor C. Shomaker*, 38 T.C. 192, 202 (1962). Second, the gift for purposes of the gift tax return was completed on December 23, 1957. This was after the decision of the circuit court in *Siegel*. Furthermore, the Tax Court's opinion in *Siegel* was promulgated on June 29, 1956, and *Chase Manhattan Bank*, which *Siegel* relied on in determining gift tax computations, was a Tax Court opinion rendered as early as December 22, 1955.

Petitioner in its reply brief brought to issue one point which was not part of its petition or its original brief.[21] This point is:

---

[20] SEC. 2503. TAXABLE GIFTS.

(b) EXCLUSIONS FROM GIFTS.—In the case of gifts (*other than gifts of future interests in property*) made to any person by the donor during the calendar year 1955 and subsequent calendar years, the first $3,000 of such gifts to such person shall not, for purposes of subsection (a), be included in the total amount of gifts made during such year. * * * [Emphasis added.]

[21] Two further points in petitioner's reply brief are properly left for determination in the parties' Rule 50 computation. These points are:

"[1] That the Court find as a matter of law that the legal expense of the petitioner as executor/trustee in prosecuting this appeal be allowed as a deduction from the gross estate of Isabelle M. Sparling."

"[2] [W]hen the date of distribution is used then the husband's share of the community property during administration of the estate shall be allowed as additional consideration to the widow for transferring her community property to the trust. The petitioner herein [relying on the *Estate of Daisy Christ, supra* at 521] so claims accrued income on Raymond's share as additional consideration to Isabelle from transferring her community property to the trust * * *"

The individual income tax returns of Isabelle M. Sparling for the years 1957 to 1964, inclusive, were also overpaid because the cost of her life estate in Raymond's share was not amortized as held in A. B. Gist, 22 AFTR 2d 5859 and Estate of Christ, supra. Petitioner requests that these years be reopened in order to correct these returns.

This issue has not been properly raised, and we must decline to consider this question. When issues are presented in the reply brief only, there is even stronger reason to disregard them than when they are raised on brief and not found in the petition, and "we have consistently held that since the primary purpose of pleadings is the joinder of issue between the parties, issues attempted to be raised by brief will be disregarded." *Eleanor C. Shomaker, supra* at 201. See also *Estate of Lyla B. Kleemeier*, 58 T.C. 241 (1972).[22]

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

---

[22] Petitioner on brief also claimed that one-half of the family allowance must be taken as a deduction in determining Raymond's estate tax and a reconsideration of Raymond's estate tax and its effect on Isabelle's return is in order. This issue was not stated in the petition and moreover is based on an incorrect assumption. The family allowance is not a deductible item in computing the estate tax. See *Majerus* v. *Coyle*, 254 F.Supp. 214 (N.D. Ill. 1966).