# UNITED STATES v. CARTWRIGHT, EXECUTOR

No. 71–1665. Argued January 16, 1973—Decided May 7, 1973

WHITE, J., delivered the opinion of the Court, in which DOUGLAS, BRENNAN, MARSHALL, BLACKMUN, and POWELL, JJ., joined. STEWART, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST, J., joined, post, p. 557.

*Solicitor General Griswold* argued the cause for the United States. With him on the brief were *Assistant Attorney General Crampton, Richard B. Stone, Loring W. Post,* and *David English Carmack.*

*Ralph J. Gregg* argued the cause for respondent. With him on the brief was *George M. Zimmermann.**

MR. JUSTICE WHITE delivered the opinion of the Court.

The Internal Revenue Code of 1954 requires that, for estate tax purposes, the "value" of all property held by a decedent at the time of death be included in the gross estate. 26 U. S. C. § 2031. By regulation, the Secretary of the Treasury has determined that shares in open-end investment companies, or mutual funds, are to be valued at their public offering price or "asked" price at the date

---

*Meyer Eisenberg* and *Robert L. Augenblick* filed a brief for the Investment Company Institute as *amicus curiae* urging affirmance.

of death. Treas. Reg. on Estate Tax § 20.2031–8 (b) (1963). The question this case presents is whether that determination is reasonable in the context of the market for mutual fund shares.

At the time of her death in 1964, Ethel B. Bennett owned approximately 8,700 shares of three mutual funds that are regulated by the Investment Company Act of 1940, 54 Stat. 789, as amended, 15 U. S. C. § 80a–1 *et seq.*[1] The 1940 Act seeks generally to regulate publicly held companies that are engaged in investing in securities. Open-end investment companies, or mutual funds, "dominate" this industry. 1966 SEC Report 43. Unquestionably, the unique characteristic of mutual funds is that they are permitted, under the Act, to market their shares continuously to the public, but are required to be prepared to redeem outstanding shares at any time. § 80a–22 (e). The redemption "bid" price that a shareholder may receive is set by the Act at approximately the fractional value per share of the fund's net assets at the time of redemption. § 80a–2 (a)(32). In contrast, the "asked" price, or the price at which the fund initially offers its shares to the public, includes not only the net asset value per share at the time of sale, but also a fixed sales charge or "sales load" assessed by the fund's principal underwriter who acts as an agent in marketing the fund's shares. § 80a–2 (a)

---

[1] The decedent owned 2,568.422 shares of Investors Mutual, Inc., in her own name, and 2,067.531 shares as trustee for her daughter. The decedent also owned 2,269.376 shares of Investors Stock Fund, Inc., and 1,869.159 shares of Investors Selective Fund, Inc.

For thorough discussions of the operations of open-end investment companies, see SEC Report on Public Policy Implications of Investment Company Growth, H. R. Rep. No. 2337, 89th Cong., 2d Sess. (1966) (hereinafter 1966 SEC Report); SEC Report of Special Study of Securities Markets, c. XI, Open-End Investment Companies (Mutual Funds), H. R. Doc. No. 95, pt. 4, 88th Cong., 1st Sess. (1963) (hereinafter 1963 Special Study).

(35).[2] Sales loads vary within fixed limits from mutual fund to mutual fund, but all are paid to the fund's underwriters; the charges do not become part of the assets of the fund.[3] The sales loads of the funds held by the decedent ranged from seven and eight percent to one percent of the fractional net asset value of the funds' shares.

---

[2] A number of mutual funds are so-called "no-load funds"; in such cases the bid and asked prices are the same. See 1966 SEC Report 58–59. The underwriter for all three funds involved in this case is Investors Diversified Services, Inc. (IDS), which is not itself an open-end investment company. IDS also serves as the investment manager of the funds, for which it receives separate management fees. See 15 U. S. C. § 80a–15.

[3] The 1963 Special Study 96–97 explained the trading in mutual fund shares as follows:

"Mutual fund shares are not traded on exchanges or generally in the over-the-counter market, as are other securities, but are sold by the fund through a principal underwriter, and redeemed by the fund, at prices which are related to 'net asset value.' The net asset value per share is normally computed twice daily by taking the market value at the time of all portfolio securities, adding the value of other assets and subtracting liabilities, and dividing the result by the number of shares outstanding. Shares of most funds are sold for a price equal to their net asset value plus a sales charge or commission, commonly referred to as the 'sales load,' and usually ranging from 7.5 to 8.5 percent of the amount paid, or 8.1 to 9.3 percent of the amount invested. A few funds, however, known as 'no-load' funds, offer their shares for sale at net asset value without a sales charge. Shares of most funds are redeemed or repurchased by the funds at their net asset value, although a few funds charge a small redemption fee. The result of this pricing system, it is apparent, is that the entire cost of selling fund shares is generally borne exclusively by the purchaser of new shares and not by the fund itself. In this respect the offering of mutual fund shares differs from, say, the offering of new shares by a closed-end investment company or an additional offering 'at the market' of shares of an exchange-listed security, where at least a portion of the selling cost is borne by the company selling the shares." (Footnote omitted.)

Private trading in mutual fund shares is virtually non-existent.[4] Thus, at any given time, under the statutory scheme created by the Investment Company Act, shares of any open-end mutual fund with a sales load are being sold at two distinct prices. Initial purchases by the public are made from the fund, at the "asked" price, which includes the load. But shareholders "sell" their shares back to the fund at the statutorily defined redemption or bid price.

Respondent is the executor of the decedent's estate. On the federal estate tax return, he reported the value of the mutual fund shares held by the decedent at their redemption price, which amounted to about $124,400. The Commissioner assessed a deficiency based upon his valuation of the shares at their public offering or asked price, pursuant to Treas. Reg. § 20.2031–8 (b).[5] Valued

---

[4] See *Estate of Wells* v. *Commissioner*, 50 T. C. 871, 873 (1968), aff'd *sub nom. Ruehlmann* v. *Commissioner*, 418 F. 2d 1302 (CA6 1969), cert. denied, 398 U. S. 950 (1970); 1966 SEC Report 42; and 1963 Special Study 96.

[5] The regulation reads, in part, as follows:

"(b) *Valuation of shares in an open-end investment company.* (1) The fair market value of a share in an open-end investment company (commonly known as a 'mutual fund') is the public offering price of a share, adjusted for any reduction in price available to the public in acquiring the number of shares being valued. In the absence of an affirmative showing of the public offering price in effect at the time of death, the last public offering price quoted by the company for the date of death shall be presumed to be the applicable public offering price. . . .

"(2) The provisions of this paragraph shall apply with respect to estates of decedents dying after October 10, 1963."

This regulation was promulgated in 1963, T. D. 6680, 28 Fed. Reg. 10872, after some years of confusion within the Treasury Department and between that Department and the Department of Justice. See the District Court's opinion, 323 F. Supp. 769, 777. A corresponding regulation was adopted for gift tax purposes. Treas. Reg. § 25.2512–6 (b).

on that basis, the shares were worth approximately $133,300. Respondent paid the deficiency of about $3,100, including interest, filed a timely claim for a refund, and, when that claim was denied, commenced a refund action in Federal District Court on the ground that the valuation based on § 20.2031–8 (b) was unreasonable. The District Court agreed with respondent and held the Regulation invalid. 323 F. Supp. 769. The Court of Appeals affirmed. 457 F. 2d 567. We granted the Government's petition for certiorari, 409 U. S. 840, because of the conflict among the circuits.[6]

We recognize that this Court is not in the business of administering the tax laws of the Nation. Congress has delegated that task to the Secretary of the Treasury, 26 U. S. C. § 7805 (a), and regulations promulgated under his authority, if found to "implement the congressional mandate in some reasonable manner," must be upheld. *United States* v. *Correll,* 389 U. S. 299, 307 (1967). See *Bingler* v. *Johnson,* 394 U. S. 741, 749–751 (1969) ; *Commissioner* v. *South Texas Lumber Co.,* 333 U. S. 496, 501 (1948). But that principle is to set the framework for judicial analysis; it does not displace it. We find that the contested regulation is unrealistic and unreasonable, and therefore affirm the judgment of the Court of Appeals.

In implementing 26 U. S. C. § 2031, the general principle of the Treasury Regulations is that the value of

---

[6] In *Estate of Wells* v. *Commissioner, supra,* the Tax Court sustained the regulation, with six judges dissenting. That decision was affirmed by the Sixth Circuit in *Ruehlmann* v. *Commissioner,* 418 F. 2d 1302 (1969), cert. denied, 398 U. S. 950 (1970). The companion gift tax regulation was upheld in *Howell* v. *United States,* 414 F. 2d 45 (CA7 1969). Regulation § 20.2031–8 (b) was held invalid in *Davis* v. *United States,* 460 F. 2d 769 (CA9 1972), aff'g 306 F. Supp. 949 (CD Cal. 1969). See also *Hicks* v. *United States,* 335 F. Supp. 474 (Colo. 1971), appeal pending in the Tenth Circuit, No. 72–1360.

property is to be determined by its fair market value at the time of the decedent's death. "The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Treas. Reg. § 20.2031–1 (b). The willing buyer-willing seller test of fair market value is nearly as old as the federal income, estate, and gifts taxes themselves, and is not challenged here.[7] Under this test, it is clear that if the decedent had owned ordinary corporate stock listed on an exchange, its "value" for estate tax purposes would be the price the estate could have obtained if it had sold the stock on the valuation date, that price being, under Treas. Reg. § 20.2031–2 (b), the mean between the highest and lowest quoted selling prices on that day. Respondent urges that similar treatment be given mutual fund shares and that, accordingly, their value be measured by the redemption price at the date of death, the only price that the estate could hope to obtain if the shares had been sold.

Respondent's argument has the clear ring of common sense to it, but the United States maintains that the redemption price does not reflect the price that a willing buyer would pay, inasmuch as the mutual fund is under a statutory obligation to redeem outstanding shares whenever they are offered. According to the Government, the only market for mutual fund shares that has both willing buyers and willing sellers is the public offering market. Therefore, the price in that market, the asked

---

[7] See Treas. Reg. 63 Relating to Estate Tax Under the Revenue Act of 1921, Art. 13 (1922 ed.) ("The criterion of such value is the price which a willing buyer will pay to a willing seller for the property in question under the circumstances existing at the date of the decedent's death . . ."); Treas. Reg. 105 Relating to the Estate Tax Under the Internal Revenue Code (of 1939), § 81.10 (1942).

price, is an appropriate basis for valuation. The central difficulty with this argument is that it unrealistically bifurcates the statutory scheme for the trading in mutual fund shares. To be sure, the fund is under an obligation to redeem its shares at the stated price. 15 U. S. C. § 80a–22 (e). But, at the time of the original purchases, both the fund and the purchasers are aware of that duty and both willingly enter into the sale transactions nonetheless. As Judge Winner correctly observed in *Hicks* v. *United States,* 335 F. Supp. 474, 481 (Colo. 1971):

> "Viewing the contract in this light meets every test of the 'willing buyer-willing seller' definition usually applied in the determination of market value. The 'willing buyer' is the fully informed person who agrees to buy the shares, agreeing at that time to sell them to the fund—the only available repurchaser—at the redemption price. The 'willing seller' is the fund which sells the shares at market value plus a load charge, and which agrees to buy the shares back at market less the load charge. That is the market, and it is the only market. It is a market made up of informed buyers and an informed seller, all dealing at arm's length."

In the context of the Investment Company Act, the redemption price may thus be properly viewed only as the final step in a voluntary transaction between a willing buyer and a willing seller. As a matter of statutory law, holders of mutual fund shares cannot obtain the "asked" price from the fund. That price is never paid by the fund; it is used by the fund when selling its shares to the public—and even then the fund receives merely the net asset value per share from the sale, with the sales load being paid directly to the underwriter. In short, the only price that a shareholder may realize and that the fund—the only buyer—will pay is the redemption

price. In the teeth of this fact, Regulation § 20.2031–8 (b) purports to assign a value to mutual fund shares that the estate could not hope to obtain and that the fund could not offer.

In support of the Regulation, the Government stresses that many types of property are taxed at values above those which could be realized during an actual sale. For example, ordinary corporate stock is valued at its fair market price without taking into account the brokerage commission that a seller must generally pay in order to sell the stock. Respondent does not contend that that approach is inappropriate or that, for example, the value of ordinary stock in an estate should be the market price at the time less anticipated brokerage fees. But § 20.2031–8 (b) operates in an entirely different fashion. The regulation includes as an element of value the commission cost incurred in the hypothetical *purchase* of the mutual fund shares already held in the decedent's estate. If that principle were carried over to the ordinary stock situation, then a share traded at $100 on the date of death would be valued, not at $100 as it now is, but at, say, $102, representing the "value" plus the fee that a person buying the stock on that day would have to pay. It hardly need be said that such a valuation method is at least inconsistent with long-established Treasury practice and would appear at odds with the basic notions of valuation embodied in the Internal Revenue Code.[8] See *Estate of Wells* v. *Commissioner,* 50 T. C. 871, 880 (1968) (Tannenwald, J., dissenting).

Even if it were assumed that the public offering price were somehow relevant to the value of mutual fund shares

---

[8] Whatever the situations may be where it is realistic and appropriate under Treas. Reg. § 20.2031–1 (b) to use a standardized retail price to measure value for estate tax purposes, it is sufficient to note here that, for the reasons given, the valuation of mutual fund shares does not present one of those situations.

privately held, there would still be the difficulty that
shares so held are, in important respects, similar to ordi-
nary corporate stock held subject to a restrictive agree-
ment (such as a first-refusal right at a specified price).
With respect to the value of such stock, the Treasury
Regulations have provided that the price that may be
obtained in the marketplace does not control. Rather,
so long as the restriction is a bona fide one, the value of
the shares in the hands of the restricted stockholder is
determined in accordance with the terms of the restric-
tion. Treas. Reg. § 20.2031–2 (h). Outstanding mutual
fund shares are likewise held subject to a restriction, as
the Court of Appeals noted. 457 F. 2d, at 571. Those
shares may not be "sold" at the public offering price.
By statute, they may be "sold" back to the mutual fund
only at the redemption price. We see no valid justifi-
cation for disregarding this reality connected with the
ownership of mutual fund shares.

The Government nevertheless argues that Treas. Reg.
§ 20.2031–8 (b) reasonably values the "bundle of rights"
that is transferred with the ownership of the mutual
fund shares.[9] For this argument, heavy reliance is placed
on this Court's decisions in *Guggenheim* v. *Rasquin,*
312 U. S. 254 (1941); *Powers* v. *Commissioner,* 312 U. S.
259 (1941); *United States* v. *Ryerson,* 312 U. S. 260
(1941), which held that the cash-surrender value of a
single-premium life insurance policy did not necessarily
represent its only taxable value for federal gift tax pur-

---

[9] The Government argues that, as a practical matter, an estate
would rarely be hurt by valuation of mutual fund shares at the
asked price, because Treas. Reg. § 20.2053–3 (d) (2) permits an estate
to deduct the difference between the asked and bid prices if the shares
are sold to pay certain enumerated expenses. By its terms, however,
that regulation applies only if "the sale is *necessary*" to pay those
expenses. (Emphasis added.) In any event, the regulation is inap-
plicable altogether if the shares are transferred in kind to an heir or
legatee.

poses.[10] In *Guggenheim,* the lead case, the taxpayer pur-
chased single-premium life insurance policies with an
aggregate face value of one million dollars for approxi-
mately $852,000 and, shortly thereafter, gave the policies
to her children. On the gift tax return, the policies were
listed at their cash-surrender value of about $717,000—
admittedly the only amount the donor or the donees could
receive, if the policies were surrendered. But the Com-
missioner valued the gift at the cost of the policies, and
this Court upheld that valuation: "the owner of a fully
paid life insurance policy has more than the mere right
to surrender it; he has the right to retain it for its invest-
ment virtues and to receive the face amount of the
policy upon the insured's death. That these latter
rights are deemed by purchasers of insurance to have
substantial value is clear from the difference between the
cost of a single-premium policy and its immediate or early
cash-surrender value . . . ." 312 U. S., at 257. Because
the "entire bundle of rights in a single-premium policy"
is so difficult to give a realistic value to, the Court
deferred to the Commissioner's determination and per-
mitted valuation to be based on cost: "Cost is cogent
evidence of value." *Id.,* at 258. But as the District
Court observed, 323 F. Supp., at 773, shares in mutual
funds are quite unlike insurance policies, particularly in
light of the policyowner's right to receive the full face
value of the policy upon the insured's death. Moreover,
mutual fund shares present no analogous difficulties in

---

[10] It is no coincidence that the contested regulation was placed in
Treas. Reg. § 20.2031–8, which deals with "[v]aluation of certain life
insurance and annuity contracts . . . ." But we agree with Judge
Winner:

"The Commissioner cannot cross-breed life insurance and investment
trust shares by the simple expedient of discussing them in separate
paragraphs of a single regulation." *Hicks* v. *United States,* 335 F.
Supp., at 482.

valuation. On any given day, their commercial value may be determined by turning to the financial pages of a newspaper. Obviously, with respect to mutual funds, there are "investment virtues" and the prospects of capital gains or dividends. But that is true of any corporate security. Nonetheless, shareholders in mutual funds are singled out by the Regulation and their holdings valued at an unrealistic replacement cost—which includes "brokers' commissions"—while other shareholdings are valued without regard to such commissions.

The unrealistic nature of this difference in treatment may be demonstrated by comparing the treatment of shares in load funds, such as the decedent's, with shares in no-load funds. Obviously, even if it could be argued that there are relevant differences between mutual fund shares generally and corporate stock, there are no differences in terms of "investment virtues" or related interests between no-load and load fund shares. Indeed, as the terms imply, the only real distinction between the two is that one imposes an initial sales charge and the other does not.[11] Nonetheless, under the Regulation, a share in a no-load fund is valued at its net asset value while a share in a load fund is valued at net asset value plus sales charge. To further illustrate, consider a decedent who had purchased one share in each of two no-load mutual funds, at $100 per share. The decedent died before either appreciated, but after one of the funds had changed to a load fund. Although both shares are still worth $100, and could be redeemed for only that amount, the Regulation would require that one be valued at $100 and the other at $100 plus the new load charge. A regulation that results in such differing treatment of identical property should be supported by something more than a transparent analogy to life insurance.

---

[11] See 1966 SEC Report 51–59.

We recognize that normally "Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." *Commissioner v. South Texas Lumber Co.,* 333 U. S., at 501. But even if the Regulation contested here is not, on its face, technically inconsistent with § 2031 of the Internal Revenue Code, it is manifestly inconsistent with the most elementary provisions of the Investment Company Act of 1940 and operates without regard for the market in mutual fund shares that the Act created and regulates. Cf. *L. E. Shunk Latex Products, Inc. v. Commissioner,* 18 T. C. 940 (1952). Congress surely could not have intended § 2031 to be interpreted in such a manner. The Regulation also imposes an unreasonable and unrealistic measure of value. We agree with Judge Tannenwald, who stated at the very outset of the dispute over Regulation § 20.2031–8 (b), that "it does not follow that, because [the Commissioner] has a choice of alternatives, his choice should be sustained where the alternative chosen is unrealistic. In such a situation the regulations embodying that choice should be held to be unreasonable." *Estate of Wells v. Commissioner,* 50 T. C., at 878 (dissenting opinion).

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

MR. JUSTICE STEWART, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, dissenting.

This case presents a narrow issue of law regarding the valuation of certain assets—shares in an open-end investment company or "mutual fund"—for purposes of the federal estate tax. The case turns upon a single question of law: whether or not § 20.2031–8 (b) of the Treasury Regulations, which provides a specific method for valuing such shares, represents a reasonable implementation of the legislation enacted by Congress.

On December 4, 1964, Mrs. Ethel Bennett died testate leaving, among other property, several thousand shares in three separate mutual funds. Each of the funds in question is managed by a firm known as Investors Diversified Services, Inc., and all are subject to regulation by the Securities and Exchange Commission under the Investment Company Act of 1940. In his tax return for the estate, the respondent, Mrs. Bennett's executor, valued these shares at their so-called "net asset value," that is, the amount at which the estate is entitled, as a matter of law, to have the shares redeemed by the issuer. The net asset value of a mutual fund share is calculated daily by the issuing company, and is equivalent to the fractional value per share of the fund's total net assets on that day. In addition to serving as a gauge for the redemption value of fund shares already issued, net asset value is also employed by the issuing companies in determining the price at which they will offer new shares in the fund to the public on any given day. In general, such shares are sold to the public at their net asset value plus a sales charge or "load." The load is a varying percentage of the value of the shares sold, and fluctuates in accordance with the size of the purchase. In the case of Mrs. Bennett's shares, the maximum allowable sales load at the time of her death ranged between 7% and 8%, and the minimum was 1%.

Upon receipt of respondent's return, the Commissioner, acting in accordance with Treas. Reg. § 20.2031–8 (b),* assessed a deficiency, contending that the value of

---

*The text of the regulation, insofar as relevant here, reads as follows: "The fair market value of a share in an open-end investment company (commonly known as a 'mutual fund') is the public offering price of a share, adjusted for any reduction in price available to the public in acquiring the number of shares being valued. . . ." There is a companion Gift Tax Regulation of identical import. See 26 CFR § 25.2512–6 (b).

Mrs. Bennett's shares for federal estate tax purposes was their public offering price on the date of her death, that is, the price which a member of the public would have had to pay to acquire similar shares from the issuer. This price would, of course, encompass not only the net asset value of the shares, but also the applicable sales load. Such a method of valuation for mutual fund shares is expressly prescribed by the Treasury Regulation noted above. Thus, the sole question before us is whether that Regulation constitutes a reasonable exercise by the Commissioner of his statutory power to prescribe "all needful rules" for the proper enforcement of the tax laws, see 26 U. S. C. § 7805, or whether the Regulation is so inherently unreasonable and inconsistent with the statute as to be invalid. *United States* v. *Correll,* 389 U. S. 299; *Bingler* v. *Johnson,* 394 U. S. 741. Upon the facts presented by this case, I cannot say that the Commissioner's Regulation is invalid, and I therefore dissent from the decision of the Court.

At the outset, it may be well to note the basic general rule with respect to valuation that prevails under our estate tax laws. This rule is embodied in Treas. Reg. § 20.2031–1 (b), and provides that the value of property includable in a decedent's estate shall be the fair market value of such property at the date of the decedent's death. "The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." 26 CFR § 20–2031–1 (b).

The difficulty in applying this rule to mutual fund shares—a difficulty which, no doubt, led the Commissioner to promulgate Regulation § 20.2031–8 (b)—is that such shares *once issued* are not subject to disposition in a market of "willing buyers" and "willing sellers." Indeed, as both the District Court and the Court of Appeals

noted, the only practical means of disposing of mutual fund shares once acquired is redemption, and redemption cannot be deemed a sale of the sort described in the general rule (26 CFR § 20.2031–1 (b)), since the party purchasing (the issuing company) is under an absolute obligation to redeem the shares when tendered, and the party selling has no practical alternative, if he wishes to liquidate his holdings, other than to offer them to the issuing company for redemption.

This being the case, the Commissioner was faced with the problem of establishing a method of valuing the shares most nearly equal to their inherent worth. In doing so, he chose not to treat their redemption value as dispositive of this question. In promulgating his Regulation, he might rationally have considered that "on demand" redemption at net asset value is but one of many rights incident to the ownership of mutual fund shares.

For example, in the case of Mrs. Bennett's shares, her estate had not only the right to redeem them "on demand," but also to retain them; and if it had done so it would have possessed not only the normal dividend and capital gains rights associated with most investments, but also the right to have such dividends and capital gains as accrued applied toward the purchase of additional shares at a price *below* that which a member of the general public would have had to pay for such shares. In addition, under the investment contracts involved here, Mrs. Bennett's estate would have had the right to exchange her shares in any one of the three mutual funds involved for those of either or both of the other funds managed by Investors Diversified Services, Inc.—without paying the usual sales charge or load.

The Commissioner has determined that the proper method of valuing *all* the rights, both redemptive and otherwise, incident to the ownership of mutual fund shares is to determine what a member of the general pub-

lic, acting under no constraints, would have had to pay for these rights if purchased on the open market. And, as noted earlier, although no such market exists for mutual fund shares *once issued* to an investor, a perfectly normal market of willing buyers and sellers does exist with respect to such shares prior to their issuance. Thus, the Commissioner took the price at which the shares would have sold on this market as fairly reflective of their inherent worth. I cannot say that this method of valuation adopted by the Commissioner, and embodied in Regulation § 20.2031–8 (b), is so unreasonable and inconsistent with the statute as to render it invalid.

The respondent's claim that the regulation is invalid is grounded upon two principal arguments. First, he says, the estate is being taxed on an amount in excess of what it can, as a practical matter, realize from the disposition of the mutual fund shares. But this is equally true of many other assets subject to taxation under our estate tax laws. For example, real property passing into an estate is taxed upon its full fair market value, despite the fact that as a practical matter the estate must usually pay some percentage of that sum in brokerage fees if it wishes to dispose of the property and receive cash in its stead. This attack upon the Regulation thus amounts to no less than an attack upon the whole system of valuation embodied in the Treasury Regulations on Estate Tax, based as it is upon fair value in an open market. I am not ready to hold that this long-established and long-accepted system is basically invalid.

The respondent's second argument is that the Regulation places a higher valuation on mutual fund shares than is placed upon registered common stock shares and other similarly traded securities. This argument assumes that the redemption or net asset value of a mutual fund share is identical to the fair market value of a traded security, and, by a parity of reasoning, that the sales

charge or load associated with mutual fund purchases is equivalent to the commission that a stockbroker charges a purchaser of securities. Under this view, the Commissioner would be entitled to tax mutual fund shares passing into an estate only on their net asset value, since in the allegedly comparable situation of common stock shares no consideration may be given to brokers' commissions in arriving at an appropriate valuation for estate tax purposes. See 26 CFR § 20.2031–2 (b).

Although this argument has a certain superficial appeal, the analogy on which it relies is hardly an exact one. For an estate in disposing of marketable securities must pay a brokerage commission on their *sale,* and will thus realize less than the amount at which the securities have been valued, while an estate turning in mutual fund shares for redemption pays no commission or other surcharge whatever. Moreover, unlike traditional securities, there is no open trading market for mutual fund shares once issued and in the hands of an investor. If such a market of willing buyers and sellers did exist, the Commissioner would doubtless be bound to treat mutual fund shares exactly like other securities. But where no market for an asset exists, there simply is no market price to provide a readily identifiable standard for valuation. Under these circumstances, it is the Commissioner's duty under the statute to establish criteria for determining the true worth of the totality of rights and benefits incident to ownership of the asset. This the Commission has done in Regulation § 20.2031–8 (b) by providing that the value of a mutual fund share for federal estate tax purposes shall be the price a member of the general public would have to pay to acquire such share. Such an approach to the valuation of assets not regularly traded in a market of willing buyers and sellers has already been sustained by this Court in a case closely akin to the case before us. See *Guggenheim* v. *Rasquin,* 312 U. S. 254.

Given the peculiar characteristics of mutual fund shares, it is arguable that the Commissioner might reasonably have adopted a method of valuation different from that which he has chosen. But that is a question that is not for us to decide. "[We] do not sit as a committee of revision to perfect the administration of the tax laws. Congress has delegated to the Commissioner, not to the courts, the task of prescribing 'all needful rules and regulations for the enforcement' of the Internal Revenue Code. 26 U. S. C. § 7805 (a). In this area of limitless factual variations, 'it is the province of Congress and the Commissioner, not the courts, to make the appropriate adjustments.'" *United States* v. *Correll,* 389 U. S., at 306–307. See *Bingler* v. *Johnson,* 394 U. S., at 750.

I would reverse the judgment of the Court of Appeals and sustain the validity of the Regulation.