**FORMULA, et al., Plaintiffs,**

v.

**Richard S. SCHWEIKER, et al., Defendants.**

**Civ. A. No. 82–3406.**

United States District Court, District of Columbia.

Oct. 21, 1983.

Katherine A. Meyer, Public Citizen Litigation Group, Washington, D.C., for plaintiffs.

Vicki G. Golden, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

This case involves the validity of a final rule issued by the Food and Drug Administration ("FDA") establishing quality control procedures for commercially prepared infant formula products.[1] Plaintiffs, three public interest groups and four individuals, for themselves and their minor children, have brought suit pursuant to 28 U.S.C. § 1331 for declaratory and injunctive relief against defendants the Secretary of Health

and Human Services and his delegatee, the Commissioner of the Food and Drug Administration, contending that the regulation the FDA has issued violates the statute which gave birth to it, the Infant Formula Act of 1980, 21 U.S.C. § 350a (1983) ("the Act"), because it enables some infant formula products to reach the marketplace without first having been tested for the presence of certain essential nutrients. Plaintiffs seek an order declaring the current rule unlawful and directing defendants to promulgate a revised regulation on an expedited basis. The case is now before the Court on cross-motions for summary judgment which, for the reasons set forth below, are both denied without prejudice.

■ The scope of this Court's review is, of course, governed by the Administrative Procedure Act which provides that agency action is not to be set aside unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See Natural Resources Defense Council v. SEC,* 606 F.2d 1031, 1049–50 (D.C.Cir.1979). The Court may not conduct a *de novo* re-examination of the facts underlying the rule, *Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973), nor may it substitute its judgment for that of the FDA if the agency's decision was based upon the relevant factors and is not clearly in error. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971).

## I.

Congress enacted the Infant Formula Act in reaction to a 1979 incident in which two infant formula products had apparently been enabled to reach and remain on the market despite their failure to contain an important nutrient long enough to endan-

---

1. Infant formula is an alternative or supplemental food source for babies whose mothers do not breast feed or who cannot tolerate cows' milk and, thus, may constitute the primary source of nourishment during the first months of an infant's life. It is generally prepared from a "base blend" to which other ingredients are added, either separately or collectively in "premixes," and is processed in "batches" to be packaged in individual containers for distribution to the public.

ger their consumers.[2] Prior to the Act the composition of infant formulas had been regulated only to the extent of the "good manufacturing practices" required of foodstuffs generally, i.e., accurate ingredient labeling and manufacture under sanitary conditions. See S.Rep. No. 916, 96th Cong., 2d Sess. 3, 5–6 (1980), U.S.Code Cong. & Admin.News 1980, p. 2858. The Act amended existing law by providing that infant formulas would be deemed "adulterated" unless they contained some 29 "nutrients" which Congress itself declared essential by statute.[3] The Secretary was, however, given authority to revise Congress' initial list of essential nutrients, and to adjust the quantities required of and to establish "quality factors" for them, as scientific and medical knowledge of infant nutrition expanded. 21 U.S.C. § 350a(a)(2)(A)–(C) (1983); S.Rep. No. 916, 96th Cong., 2d Sess. 5 (1980); H.R.Rep. No. 936, 96th Cong., 2d Sess. 6 (1980). And the Act authorized (but did not mandate) the establishment of "such quality control procedures as the Secretary determines necessary to assure" that formulas contain those nutrients before they enter the market. 21 U.S.C. § 350a(a)(2)(D) (1983).[4] There is little doubt that Congress expected the FDA to take further action, but, having pointed the way, there is even less that it intended the FDA to have considerable latitude in the manner of taking it.

In December, 1980, the FDA published a "proposed rule" specifying a "systematic procedure of sampling, testing, analyses, and recordkeeping" which would have imposed a uniform comprehensive pre-marketing quality control regime on all manufacturers for all formula products. See 45 Fed.Reg. 86362–70 (1980) (to be codified at 21 C.F.R. pt. 106) (proposed Dec. 30, 1980). Over the ensuing months, however, FDA received some 300 comments on the proposal of which a number, including those of the American Medical Association and the American Academy of Pediatrics, suggested that some of the proposed testing was unnecessary and could safely be eliminated to avoid a drastic increase in the price of infant formula (or the disappearance of some specialized formula products from the market altogether). And the trade organization representing major formula manufacturers expressed concern that the testing protocol would not be compatible with all manufacturing processes.

In April, 1982, FDA issued a revised tentative "final rule," 47 Fed.Reg. 17016–27 (1982) (to be codified at 21 C.F.R. pt. 106), which became effective, unchanged, on July 19, 1982, notwithstanding objections from, inter alia, plaintiff Formula. The final rule differs substantially from the original proposed rule in that, instead of prescribing a specific testing procedure, it permits "each manufacturer to establish a quality control system ... that is best suited to its needs." Id. at 17016. A formula manufacturer[5] must promulgate a "master manufacturing order" which will establish a quality control system that "assures and verifies the addition of each ingredient." 21 C.F.R. § 106.-

---

2. The products, reformulations of older products, were discovered to contain inadequate levels of chloride. As a result, a substantial number of the infants who received them developed a rare but potentially lethal chemical imbalance known as hypochloremic metabolic alkalosis characterized by loss of appetite, failure to gain weight, and a general "failure to thrive." No deaths were attributed to the deficiency, but the long-term effect on the infants is unknown. See 45 Fed.Reg. 86362 (1980) (to be codified at 21 C.F.R. pt. 106) (proposed Dec. 30, 1980). Plaintiffs have documented several similar incidents since the passage of the Infant Formula Act as evidence of the need for effective regulation and enforcement by the FDA.

3. Adulterated products may not be sold in interstate commerce, are subject to seizure, condemnation and destruction, 21 U.S.C. §§ 331(a), 334, and their purveyors subject to civil and criminal sanctions. Id. §§ 332, 333.

4. The Secretary has delegated his functions under the Act to the Commissioner of the FDA subject to a reservation of authority concerning rules, such as the one in issue, presenting "highly significant public issues" of, inter alia, the quality of FDA-regulated products. See 47 Fed.Reg. 17016 (1982) (to be codified at 21 C.F.R. pt. 106).

5. The "manufacturer" is the one who "packages the product in a container for distribution." 21 C.F.R. § 106.3(c) (1983).

25(a) (1983). But manufacturers need not test for the ingredients contained in pre-mix[6] if the premix supplier "certifies" as to its composition. *Id.* at § 106.20(b)(2). And six other statutorily specified nutrients are exempted from the verification process al-together, *Id.* at 106.30(b)(1)(ii), either be-cause FDA determined that they were less critical and less likely to be absent or the tests for them too time consuming and ex-pensive, or both. 47 Fed.Reg. 17021 (1982) (to be codified at 21 C.F.R. pt. 106). Thus, as FDA acknowledges, mandatory testing for all of the essential nutrients actually occurs only during the random inspections the regulation requires manufacturers to make of "at least one newly processed fin-ished product batch" every three months. 21 C.F.R. § 106.30(b)(2) (1983).

## II.

The policy served by the Infant Formula Act, simply stated, is that "[m]ore than any other food product, the public rightfully expects infant formula to be manufactured to exacting standards.... For parents to continue to have confidence in the quality of formula upon which their children de-pend, they must be assured that formula contains all essential nutrients prior to mar-keting." S.Rep. No. 916, 96th Cong., 2d Sess. 4 (1980), U.S.Code Cong. & Admin. News 1980, p. 2861; H.R.Rep. No. 936, 96th Cong., 2d Sess. 5 (1980). It is clear Con-gress intended that henceforth no nutrient-deficient (or, for that matter, any otherwise defective) infant formula should be accessi-ble to potential consumers at all.

Plaintiffs contend that the FDA has "left up to the manufacturers" what Congress entrusted to the FDA. Perhaps it has, but all Congress directed that the FDA do was to "establish such quality control procedures as [it] ... determines necessary to assure that an infant formula provides [the] nu-trients" required by the Act. 21 U.S.C. § 350a(a)(2)(D) (1983). The FDA may have concluded that the formula manufacturers

are, ultimately, the most reliable overseers of the nutritional adequacy of their own products and can be relied upon to test responsibly, for they run the risk of far more than governmental sanctions if they fail to do so. But if it has so concluded the record before the Court does not demon-strate the basis for the conclusion.

Plaintiffs also criticize the disparity be-tween the proposed and final rules as to the lacunae in the testing requirements. The FDA observes that the statute says only that quality control procedures adopted by the agency "shall include the *periodic* test-ing of infant formulas to determine wheth-er they are in compliance with [the Act]." 21 U.S.C. § 350a(a)(2)(D) (1983). (Empha-sis supplied). Congress did not say what it meant by the adjective. It could have in-tended just the sort of sporadic testing of representative parts the FDA's final rule entails. But there is nothing in either the Act or its history, or, for that matter, in the word "periodic" itself, to suggest that it had in mind anything less than testing what is destined to be the contents of each con-tainer of formula at one or more intervals in the course of its concoction. Presumably either meaning would suffice if the test procedures themselves gave the necessary assurance.

Neither the administrative record com-piled before the FDA nor any evidentiary record here, however, explains, for example, why a premix supplier's "certificate" of nu-trient content in his partial product is any more trustworthy than a manufacturer's would be with respect to completed formu-la, in the absence of any testing oversight of the suppliers. Nor does the record dis-close how the FDA was able to conclude that some nutrients are less essential than others, and can therefore be tested for less frequently, when Congress itself declared them all to be essential and directed the FDA to devise means to ensure their pres-ence in all formula products unless it for-mally revised the list. Nor does it help to

**6.** A "premix" is a "combination of ingredients containing two or more nutrients." 21 C.F.R. § 106.3(e) (1983). There is apparently no limit to the number of nutrients which may be incor-porated by way of premix.

understand how the analysis of a single newly-processed batch of formula at random every three months is calculated to give assurance that those produced in the interim are not flawed.

■ Administrative regulations cannot be sustained if they are inconsistent with the statute under which they are promulgated. *United States v. Larionoff,* 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977); *United States v. Cartwright,* 411 U.S. 546, 557, 93 S.Ct. 1713, 1719, 36 L.Ed.2d 528 (1973). They must further, not frustrate, the manifest congressional design. *See United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 26, 102 S.Ct. 821, 828, 70 L.Ed.2d 792 (1982). In this case, it is not clear that the provisions of the final rule do not undermine the Act's primary goal of nutrient-replete formula without exception; but, then, neither is it clear that they do.

■ It is, of course, beyond this Court's province to determine precisely what type of nutrient testing must be conducted, or of what, when, and how often in the manufacturing process it should occur. It must only satisfy itself that the agency "has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent," *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 850 (D.C. Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971), which seems here, at least, to contemplate, at a minimum, a rule requiring verifiable testing by someone for each of the essential nutrients before any infant formula is offered to the public.

Therefore, it is this 20th day of October, 1983,

ORDERED, that plaintiffs' motion for summary judgment is denied; and it is

FURTHER ORDERED, that defendants' motion for summary judgment is denied; and it is

FURTHER ORDERED, that a status conference will be held on October 27, 1983, at 9:30 a.m. to consider further proceedings herein.