

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-17-2002

# Emerson Radio Corp v. Stelling

Precedential or Non-Precedential: Non-Precedential

Docket No. 01-3689

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Emerson Radio Corp v. Stelling" (2002). *2002 Decisions.* Paper 657.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/657

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 01-3689
_____

EMERSON RADIO CORP; THOMAS HACKETT;
FIDENAS INTERNATIOL BANK; GEOFFREY P. JURICK;
WAYNE J. ARANHA

v.

DONALD K. STELLING; PETRA JACOBS STELLING;
ERIC F. GEBAIDE; FIDENAS INTERNATION LIMITED;
ELISION INTERNATIONAL INC.

BARCLAYS BANK PLC  (Intervenor in D.C.)

Petra Jacobs Stelling,
                                        Appellant

(Newark N.J. Civil No. 94-cv-03393)

WAYNE J. ARANHA, Official Liquidator of FIDENAS INVESTMENT LIMITED

v.

GEOFFREY P. JURICK; GSE MULTIMEDIA TECHNOLOGIES CORPORATION;
FIDENAS INTERNATIONAL LIMITED, L.L.C.; ELISION INTERNATIONAL INC.

(Newark N.J. Civil No. 96-cv-01695)

WAYNE J. ARANHA, Provisional Liquidator

v.

FIDENAS INVESTMENT LIMITED, Debtor in a foreign proceeding,
(Case No. 94-D 42677(BRL), USBC, S.D.N.Y.)

(Newark N.J. Civil No. 94-cv-04380)

THOMAS HACKETT, Official Liquidator;
FIDENAS INTERNATIONAL BANK LIMITED

v.

GEOFFREY P. JURICK; ERIC F. GEBAIDE; FIDENAS INTERNATIONAL
LIMITED;
WAYNE J. ARANHA, Official Liquidator of Fidenas International Bank Limited

BARCLAYS BANK PLC  (Intervenor in D.C.)
(Newark N.J. Civil No. 95-cv-01179)
_____

No. 01-3818
_____

EMERSON RADIO CORP; THOMAS HACKETT;
FIDENAS INTERNATIOL BANK; GEOFFREY P. JURICK;
WAYNE J. ARANHA

v.

DONALD K. STELLING; PETRA JACOBS STELLING;
ERIC F. GEBAIDE; FIDENAS INTERNATION LIMITED;
ELISION INTERNATIONAL INC.

BARCLAYS BANK PLC   (Intervenor in D.C.)

Geoffrey P. Jurick,
Appellant

(Newark N.J. Civil No. 94-cv-03393)

WAYNE J. ARANHA, Official Liquidator of FIDENAS INVESTMENT LIMITED

v.

GEOFFREY P. JURICK; GSE MULTIMEDIA TECHNOLOGIES CORPORATION;
FIDENAS INTERNATIONAL LIMITED, L.L.C.; ELISION INTERNATIONAL INC.

(Newark N.J. Civil No. 96-cv-01695)

WAYNE J. ARANHA, Provisional Liquidator

v.

FIDENAS INVESTMENT LIMITED, Debtor in a foreign proceeding,
(Case No. 94-D 42677(BRL), USBC, S.D.N.Y.)

(Newark N.J. Civil No. 94-cv-04380)

THOMAS HACKETT, Official Liquidator;
FIDENAS INTERNATIONAL BANK LIMITED

v.

GEOFFREY P. JURICK; ERIC F. GEBAIDE; FIDENAS INTERNATIONAL
LIMITED;
WAYNE J. ARANHA, Official Liquidator of Fidenas International Bank Limited

BARCLAYS BANK PLC   (Intervenor in D.C.)
(Newark N.J. Civil No. 95-cv-01179)
_____

No. 02-3570
_____

EMERSON RADIO CORP; THOMAS HACKETT;
FIDENAS INTERNATIOL BANK; GEOFFREY P. JURICK;
WAYNE J. ARANHA

v.

DONALD K. STELLING; PETRA JACOBS STELLING;
ERIC F. GEBAIDE; FIDENAS INTERNATION LIMITED;
ELISION INTERNATIONAL INC.

BARCLAYS BANK PLC  (Intervenor in D.C.)

Petra Jacobs Stelling,
                                        Appellant

(Newark N.J. Civil No. 94-cv-03393)

WAYNE J. ARANHA, Official Liquidator of FIDENAS INVESTMENT LIMITED

v.

GEOFFREY P. JURICK; GSE MULTIMEDIA TECHNOLOGIES CORPORATION;
FIDENAS INTERNATIONAL LIMITED, L.L.C.; ELISION INTERNATIONAL INC.

(Newark N.J. Civil No. 96-cv-01695)

WAYNE J. ARANHA, Provisional Liquidator

v.

FIDENAS INVESTMENT LIMITED, Debtor in a foreign proceeding,
         (Case No. 94-D 42677(BRL), USBC, S.D.N.Y.)

(Newark N.J. Civil No. 94-cv-04380)

THOMAS HACKETT, Official Liquidator;
FIDENAS INTERNATIONAL BANK LIMITED

v.

GEOFFREY P. JURICK; ERIC F. GEBAIDE; FIDENAS INTERNATIONAL
                     LIMITED;
WAYNE J. ARANHA, Official Liquidator of Fidenas International Bank Limited

BARCLAYS BANK PLC  (Intervenor in D.C.)
         (Newark N.J. Civil No. 95-cv-01179)
                _____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF NEW JERSEY
            D.C. Civil No. 94-cv-3393
    District Judge:  The Honorable Nicholas H. Politan
                _____

Argued July 24, 2002
                _____

Before: SLOVITER, NYGAARD, and BARRY, Circuit Judges

(Opinion Filed:   October 17, 2002)
                _____

Frederick R. Kessler, Esquire (Argued)
Wollmuth, Maher & Deutsch
500 Fifth Avenue
New York, NY 10110

Attorney for Appellant/Cross Appellee

Gerald Krovatin, Esquire (Argued)
Krovatin & Associates
744 Broad Street, Suite 1901
Newark, NJ 07102

Attorney for Appellee/Cross Appellant

—————————

OPINION

—————————


BARRY, Circuit Judge

We are called upon in what the District Court described as this "seemingly endless litigation saga" to review the appeal of appellant Petra Jacobs Stelling and the cross-appeal of Geoffrey P. Jurick from the District Court's Letter Opinion and Order dated August 29, 2001. Stated somewhat simply, Stelling appeals the entry of an order fixing the amount to which she is entitled after the termination of an agreement entered into by the parties. Jurick, in turn, cross-appeals the termination itself and the order fixing the amount. For the reasons that follow, we will affirm in part and reverse in part. We have jurisdiction under 28 U.S.C. 1292(b).

The parties are fully familiar with the long and arduous history of this case and we see no need to reprise that history here, particularly given the fact that we are writing only for the parties in this not precedential opinion. We, therefore, will recount only those facts necessary to place into perspective the issues we are called upon to decide.

In 1994, Emerson Radio Corp. ("Emerson") emerged from bankruptcy pursuant to a plan of reorganization. It then issued 30 million shares, and the creditors claimed entitlement to some of them. Subsequent litigation between Stelling and other creditors, on the one hand, and Emerson and its CEO Jurick, on the other, led to a 1996 Stipulation of Settlement and Order (the "Agreement"). The parties stipulated in that Agreement that Jurick and certain related parties were jointly and severally liable to Stelling for $21 million (the "Consent Judgment"), as well as to other creditors for other amounts. 29,152,542 shares of Emerson common stock were deposited with the District Court, a portion of the proceeds from the sale of which were to satisfy the Consent Judgment. Certain shares were deposited with the Court as "Pool A" shares to be marketed by an Advisor with the proceeds of the sale to be distributed to Stelling and the other creditors. To avoid default on an earlier Indenture to which Jurick was subject, a separate block of shares, the "Pool B" shares, were also deposited with the Court but held in Jurick's name in order to retain his beneficial ownership of 25% of Emerson's outstanding common shares. The Pool A and Pool B shares secured the payment of the amount due the creditors.

The Advisor, appointed by the Court, determined that for a number of reasons it was unfeasible or even impossible to sell the shares on the market. In March 2000, therefore, the District Court, acting pursuant to the Agreement, terminated it after finding that there were no reasonable prospects for achieving its goals. The following May, the Court released approximately 8 million shares to Stelling (her portion, as among the creditors, of the Pool A shares), which she shortly thereafter sold to Emerson for $.50 per share. In accordance with the language of the Agreement, which provided for entry or release of the Consent Judgment upon termination of the Agreement by the Court, Stelling then requested a restated judgment that reflected a credit for the sale to Emerson (that is, reducing the amount of the Consent Judgment to take into account the money received from the sale). Jurick did not accept the proposed restated judgment, and in late 2000, Stelling moved for the original Consent Judgment to be entered and released. The District Court held hearings in June 2001 for the purpose of valuing both the Pool A and Pool B shares to determine the amount by which the Consent Judgment should be reduced or restated.

In August 2001, the District Court determined the value of the shares, and thus the credit to be applied and the ultimate amount due Stelling $9,717,020.12. As suggested above, neither party was happy with the District Court's ruling, and both appealed.

I.

It is appropriate to begin our discussion with that part of Jurick's cross-appeal that challenges the termination of the Agreement because only if termination was proper do we reach the issues raised by what happened thereafter. Critical to this discussion, of course, is the language of the termination provision of the Agreement. That provision, 11(b)(v), states:

> (b) Termination Upon the Order of the Court. In the event . . . (v) that there is no reasonable prospect that the goals contemplated by this Stipulation and Order can be achieved, then any Creditor may apply to the Court, on notice to all other Lead Parties, for an order from the Court declaring that the Stipulation and Order is terminated. After a hearing, at which any Lead Party may participate, the Court, in its discretion, based on the totality of the circumstances, including, without limitation, evidence with respect to the then-current Marketing Plan or other advice or opinions of the Advisor and the value of the remaining Emerson Shares, if any, and the available ways and means of realizing such value, shall determine whether to order the termination of this Stipulation and Order on the grounds that its goal and purposes are not reasonably likely to be realized.

A.77-78.

In November 1997, Stelling moved to terminate the Agreement because she had not been paid "one cent." The District Court held hearings over six days in April and July of 1998, taking extensive testimony about Emerson's financial condition from the Advisor and others. The Advisor testified that a sale of Emerson shares "for the amounts mentioned and discussed or called for in the settlement agreement are highly unlikely." A.653. He described the low stock price, the price dilution that had occurred through 1997 and which continued at that time, and Emerson's failure to meet its (and his market plan's) projected performance. The District Court, when it subsequently ruled, credited this testimony, and made explicit findings as to the impact of the large quantity of outstanding shares on share value, the low trading price of the shares, the failed negotiation for Emerson shares, and the failure of the Advisor's marketing plan and other avenues of "satisfying creditors' claims." A.1532-35.

The Court also noted the failure of certain 1999 negotiations between Emerson and Oaktree Capital Management, LLC, that would have significantly helped all parties' financial positions. The Court found that this was important evidence that there was no reasonable prospect that additional help could be found, and that Emerson's financial forecast was less than favorable. In an opinion dated March 3, 2000, the Court terminated the Agreement.

Jurick argues in his cross-appeal that despite the poor prognosis for selling the Emerson shares or increasing their value, the District Court's termination of the Agreement was premature because it did not consider the "turnaround" the company had made and the profits it had recently shown. Such a turnaround may in fact have generated profits, and there may have been long-term promise for Emerson. It is clear, however, that the District Court had the opportunity to consider all of that information, in the very, very detailed form not only of the financial statements of Emerson's Annual Reports for the years and quarters immediately preceding its opinion, but also for the periods immediately preceding the hearing on whether to terminate the Agreement. The District Court indicated that it found these Reports insufficiently persuasive as to Emerson's promise, especially given the Advisor's observation that Emerson stock prices had not responded even to the increased profits.

Somewhat relatedly, the Advisor testified that an alternative means of increasing Emerson's profitability, i.e. changing management, would require "long-term" evaluation; that is, whether a management change might help the company would take some time to determine. Also looking far into the future, one of Emerson's directors testified that in three to five years, Emerson would turn around to the point that both the share prices and the overall sale value of the company would rise. The District Court

concluded, however, that giving the additional time required to hopefully achieve financial stability and/or profitability would frustrate the purposes of the Agreement.

In terminating the Agreement, and terminating it when it did, the District Court did not abuse the discretion that the parties expressly gave it. Jurick's argument to the contrary fails.

## II.

What should have happened following termination is the focus of the parties' attention on Stelling's appeal. Again, we must initially turn to the Agreement, which, we find, clearly and explicitly provides the answer. If the District Court terminated the Agreement, as it did here, the Agreement provides, at   11(c), that, within five business days,

> . . . the parties shall take the following actions and request that the Court (or its designee) dispose of the documents deposited with it in the following manner:
>
> (i)  . . . the Creditors shall consult with Jurick with respect to the amount of the Consent Judgments to be entered . . . , after giving appropriate credit to the Jurick group for any payments previously made pursuant to paragraph 1 hereof. . . . Following a determination by the Creditors, which determination shall be made in their sole discretion, of the appropriate reduced amount of the Consent Judgments . . ., the Creditors shall request that, within ten (10) Business Days, Jurick cause each judgment debtor to deliver to them executed Consent Judgments, in form acceptable to counsel for the Creditors, in the reduced amounts (collectively, the "Restated Consent Judgments"). If the Restated Consent Judgments are delivered, the Creditors will then request, on notice to each of the other Lead parties, that the Court enter the Restated Consent Judgments. Upon the entry by the Court of the Restated Consent Judgments, the original Consent Judgments shall returned to the judgment debtors. If all of the Restated Consent Judgments are not delivered or any proposed judgment debtor seeks to be heard in any respect concerning the amount or form of any Restated Consent Judgment, then the Court will enter the original Consent Judgments (in the amount of . . . $49.5 million against Jurick and each other judgment debtor). Following the entry of the original Consent Judgments or the Restated Consent Judgments, the Creditors may take any action permitted by law to execute upon their Consent Judgments to collect the unpaid balance. . . .

A.78-80.

After the March 2000 termination of the Agreement, Stelling proposed a restated consent judgment to Jurick. Jurick did not accept the restated judgment, and Stelling submitted a proposed order to the District Court restating the original Consent Judgment and releasing and entering it. The Court heard argument on the issue of entry of the judgment, but did not resolve the issue. Instead, hearings were held to value the shares. hearings which led to the August 29, 2001 order from which these appeals were taken. Stelling argues that the Court should not have held these hearings, but, rather, and without more, should have entered the original Consent Judgment given her compliance with the procedure outlined in   11(c) and Jurick's opposition to the restated judgment and consequent refusal to deliver it.

Settlement agreements are often treated as contracts, and basic contract principles apply. In re: Cendant Corp. Prides Litig., 233 F.3d 188, 193 (3d Cir. 2000); see also Coltec Industries, Inc. v. Hobgood, 280 F.3d at 262, 269 (3d Cir. 2002). There is little question that, given that fact, a court should endeavor to stay within the "four corners" of the agreement and abide by the plain meaning of what the parties have agreed to. New York State Elec. & Gas Corp. v. Federal Energy Reg. Comm'n, 875 F.2d 43, 45 (3d Cir. 1989) (stating that "contract principles are generally applicable to the construction of settlement agreements and that it would be error . . . to depart from the plain meaning of a settlement agreement in establishing the parties' obligations"). It is a given that the language of an agreement should not be tortured to create an ambiguity where none exists. It is also a given, of course, that the parties' intent is important.

Paragraph 11(c) clearly and unambiguously provides that, within five business days of the termination, the creditors shall consult with Jurick as to the amount of the consent judgments to be entered after giving appropriate credit to the Jurick group for any payments previously made by Jurick or his group. If there is no agreement as to the reduced amount, which amount is in the sole discretion of the creditors to determine, the Court will enter the original consent judgments $21,000,000 as to Stelling and the creditors may execute upon them to collect the unpaid balance.

Prior to the March 3, 2000 termination, there were no payments which had been "previously made" to Stelling and, thus, no reduced amount much less any agreement on a reduced amount. The District Court, then, under the plain language of the Agreement should have entered the original Consent Judgment. Indeed, in its March 3rd opinion, that is precisely what the Court said it was going to do:

> [T]he standards for termination have been met and the Stipulation is declared terminated. The Consent Judgments executed as part of the Stipulation of Settlement will be released upon appropriate applications. The issue which remains to be decided is the appropriate distribution of the shares of stock previously deposited with the Court.

A.1535.

That should have been, but was not, the end of it. Although counsel agreed that, under the Agreement, upon termination the Consent Judgment would be entered, they also agreed with the District Court that the Pool A shares sold by Stelling to Emerson albeit after termination should act as a credit against that Judgment. A.7. Jurick argued that the Pool B shares should also act as a credit, and the District Court agreed, believing that "to permit Mrs. Stelling to obtain a judgment without regard to the value of the retained [Pool B] shares would increase the agreed amount of liability by the value of the shares, a result not contemplated by nor agreed to in the Stipulation." Id. And so commenced valuation hearings as to both the Pool A and Pool B shares, although the Agreement itself provided for no such thing.

### III.

We will not attempt to put the cow back in the barn as to the Pool A shares. Those shares have been sold and the parties agreed that there should be a credit against the original Consent Judgment with the only dispute being how much. Stelling essentially argues that because she sold her Pool A shares to Emerson for $0.50, the District Court's finding, which Jurick accepts, that the fair market value was closer to $0.8675 was erroneous. The value assigned to those shares by the District Court is a factual determination we review for clear error. Matter of Bankers Trust Co., 658 F.2d 103, 108 (3d Cir. 1981)(in assessing the worth of a destroyed ship, clearly erroneous standard applies to determination of fair market value).

Ordinarily, in assessing the value of shares of stock, "the average exchange price quoted on the valuation date furnishes the most accurate, as well as the most readily ascertainable, measure of fair market value." Amerada Hess Corp. v. Commissioner of Internal Revenue, 517 F.2d 75, 83 (3d Cir. 1975) (citing United States v. Cartwright, 411 U.S. 546, 551 (1973)). This typical measure, however, is subject to exceptions for instance, when the trading date reflects an atypically high or low value; when shares have some other restrictions on them; or when, as here, a "blockage discount" might apply because the sale in question involved an "exceptionally large block" of shares. Amerada Hess, 517 F.2d at 83-84 & n.33; see also Seas Shipping Co. v. Commissioner, 371 F.2d 528 (2d Cir. 1967). We noted in Amerada Hess, however, that even under such "exceptional" cases, the observed market value might be a more appropriate benchmark, in part because the vagaries of the market to which investors subject themselves include such factors. Id. at 84; cf. id. at 92 (Hunter, J., concurring in part and dissenting in part

Stelling argues that, under that reasoning and barring other evidence, the $0.50 price at which she sold the Pool A shares to Emerson is a better benchmark of value and the Consent Judgment should be reduced by applying that price, rather than $0.8675. We disagree.

First, the District Court explained why it found the $0.50 value unfair and why it found that the amount of credit to be deducted from the proposed judgment should be $0.8675 per share:

> This is the exact amount that was paid for the shares beneficially owned by
> [the other creditors] shortly before the sale by Mrs. Stelling of her shares
> for $0.50.  This is also the amount that was offered to Mrs. Stelling for her
> Pool A shares . . . [Her] sale was not triggered by an offer made by
> Emerson.  Rather, it was Mrs. Stelling who offered the shares to Emerson
> for $0.50 per share.  Why that offer was made for $0.50 per share and not
> $0.8675 per share is a total mystery to this Court.

A.7-8.  Moreover, as Stelling's own expert testified on cross-examination, a price of 50, 60, 70, or 87 cents for these shares would have been "fair."  A.1786.

> [T]he clearly erroneous standard of review does not permit an appellate
> court to substitute its findings for those of the trial court.  It allows only an
> assessment of whether there is enough evidence on the record to support
> those findings.  That a different set of inferences could be drawn from the
> record is not determinative.  It is sufficient that the District Court findings
> of fact could be reasonably inferred from the entire trial record.

Scully v. US WATS, Inc., 238 F.3d 497, 506 (3d Cir. 2001) (citations and internal quotation marks omitted).  There was no clear error in determining that $0.8675 was a better estimate of the Pool A shares' value than was $0.50, and we will affirm the District Court's Order of August 29, 2001 insofar as it valued the Pool A shares.

IV.

We will not enter into the fray with reference to the valuation of the minority, unregistered Pool B shares held in Jurick's name and wonder why the District Court felt it necessary to do so.  Again, there was no provision in the Agreement even suggesting that at termination, where no "payment" had been made, these shares   or any others should be valued and, thus, unlike the District Court, we are not "satisfied that the intent of the Agreement requires a credit for the Pool B shares."  A.7.  Moreover, Stelling argued, and continues to argue, that any valuation of Pool B shares was premature and should be addressed when she seeks to execute on the Consent Judgment for only then can an accurate valuation be performed.  The District Court did not discuss this argument, and effectively treated the Pool B shares as if they were already in Stelling's hands as "payment" towards that Judgment.  This was error.

No "payment" has been made by Jurick to Stelling vis-a-vis the Pool B shares and, indeed, may never be, unlike the Pool A shares where "payment" was made, albeit belatedly, and the original Consent Judgment credited.  Any payment now to be made by Jurick to Stelling, whether that payment be made by virtue of Jurick's sale of the Pool B shares or other sources of funds he may have at his disposal, will also be valued and deemed credited as of the time of payment.  And if the Pool B shares or a portion thereof were to be released to Stelling rather than sold by Jurick, those shares should be valued as of the time of release, for that would be the time of payment. Even counsel for Jurick conceded that "until there is some value realized for the shares, your Honor can't fix the appropriate amount."  A.1823.  It is, in our view, the amount of monies or shares paid to Stelling   if and when they are paid   that should be credited against the Consent Judgment, not some value predicated on largely hypothetical facts and assumptions.

Parenthetically, at oral argument before us, we suggested the possibility of crediting the value of the Pool A shares to the original Consent Judgment ($21,000,000 with a credit of $7,094,009.88) and releasing all or part of the Pool B shares to Jurick who could then sell those shares, pay the proceeds to Stelling, and receive a credit for that amount.  This, indeed, was suggested by the District Court at one point and, while both counsel were receptive, one or both clients apparently were not.  (A.1690-91, 1702, 1713, 1817).

We recognize, of course, that the retained Pool B shares are meant to serve as collateral for the Judgment.  It is at least conceivable that that collateral could be dissipated if turned over to Jurick.  We note, however, that the Agreement contemplated the appointment of a Settlement Agent authorized, subject to certain provisions which we need not describe, to sell Emerson shares and distribute the proceeds to the creditors and to Jurick.  A.51-52.  While the sales were to be made under a marketing plan that, as far as the record reflects, did not come to fruition, the concept of a disinterested third party

being authorized to sell the Pool B shares, with the proceeds sufficient to satisfy the Judgment thereafter paid to Stelling, seems to make sense.  We leave that to the District Court to consider on remand if it becomes necessary for the Court to reach the issue of the disposition of the Pool B shares.

In summary, then, we will affirm in part and reverse in part the District Court's order of August 29, 2001 and remand for the District Court to enter judgment in favor of Stelling and against the Jurick parties for the sum of $21,000,000 less $7,094,009.88 for a net sum of $13,905.990.12.


TO THE CLERK OF THE COURT:
Kindly file the foregoing Opinion.


/s/ Maryanne Trump Barry
Circuit Judge