T.C. Memo. 2001-24

UNITED STATES TAX COURT

DONALD J. JANDA, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

DOROTHY M. JANDA, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 5100-99, 5101-99.          Filed February 2, 2001.

<u>Larry A. Holle</u> and <u>Terry R. Wittler</u>, for petitioners.

<u>Henry N. Carriger</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  In these consolidated cases, respondent determined separate gift tax deficiencies of $73,323 against petitioners Donald J. Janda (Mr. Janda) and Dorothy M. Janda (Mrs. Janda) for 1992.  The issue for decision is the fair market value of the shares of stock in the St. Edward Management Co. (the Company) transferred by each petitioner to their children.

Section references are to the Internal Revenue Code in effect for the year in issue.  Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact and the attached exhibits are incorporated herein by this reference.  At the time of the petition, petitioners resided in St. Edward, Nebraska.

In 1992, the Company operated as a holding entity, owning 94.6 percent of 2,250 shares of stock outstanding in the Bank of St. Edward (the Bank).  The Bank served the financial needs of a small agricultural community in Nebraska.  Mr. Janda operated the Bank in the capacity of president, while Mrs. Janda, involved as well in the day-to-day activities of the Bank, served as vice president.  The Bank employed Kenneth Wolfe in the position of "cashier" as well as three to four tellers.  As of December 31, 1992, the stockholders' equity in the Bank was listed at an unadjusted book value of $4,518,000, or $2,008 per share.

In November 1992, petitioners each made gifts of 6,850 shares of stock in the Company (transferred block of stock) to each of their children (Robert Janda, Donald Janda, Jr., Catherine Moeller, and Constance Janda).  At the time of the gifts, the Company had 130,000 shares of stock outstanding.  Each transferred block of stock therefore constituted a 5.27-percent interest in the Company.

Before the transfers, petitioners, their children, and Mr. Wolfe owned the following amounts and percentages of shares of stock in the Company:

| Shareholder | Shares | Percent of Shares Outstanding |
|---|---|---|
| Mr. Janda | 30,867 | 23.74 |
| Mrs. Janda | 30,868 | 23.74 |
| Robert Janda | 17,066 | 13.13 |
| Donald Janda, Jr. | 17,066 | 13.13 |
| Catherine Moeller | 17,066 | 13.13 |
| Constance Janda | 17,066 | 13.13 |
| Kenneth Wolfe | 1 | 0 |
| Total | 130,000 | 100.00 |

After the transfers, the children's stake in the Company increased while petitioners' stake declined as reflected in the following table:

| Shareholder | Shares | Percent of Shares Outstanding |
|---|---|---|
| Mr. Janda | 3,467 | 2.67 |
| Mrs. Janda | 3,468 | 2.67 |
| Robert Janda | 30,766 | 23.67 |
| Donald Janda, Jr. | 30,766 | 23.67 |
| Catherine Moeller | 30,766 | 23.67 |
| Constance Janda | 30,766 | 23.67 |
| Kenneth Wolfe | 1 | 0 |
| Total | 130,000 | [1]100.00 |

[1] On account of rounding, the sum of the individual percentages of shares outstanding does not equal 100 percent.

As of December 31, 1992, the Company reported an unadjusted

book value of $4,602,732 for stockholders' equity, or approximately $35.41 per share, on its balance sheet.  Each transferred block of stock therefore commanded $242,559 of the total stockholders' equity documented on the Company's books.[1] After retaining the accounting firm of Grant Thornton, petitioners each filed a Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return, reporting the values of the gifts as determined by the accounting firm.  Petitioners reported each transferred block of stock at a fair market value of $145,357.

## OPINION

Congress has imposed a tax on the transfer of property by gift.  See sec. 2501(a)(1).  The amount of the gift subject to taxation is equal to the fair market value of the property on the date of the gift.  See sec. 2512(a); sec. 25.2512-1, Gift Tax Regs.  The U.S. Treasury regulations define fair market value as "the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of relevant facts."  Sec. 25.2512-1, Gift Tax Regs.; see also United States v. Cartwright, 411 U.S. 546, 551 (1973); Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982).

Because prices for shares of stock in a closely held corporation are generally not available in the marketplace, we

---

[1]  $35.41 per share x 6,850 shares.

may decide the fair market value of such interests by looking at the particular company's net worth, prospective earning power, dividend-paying capacity, and other relevant factors. See Estate of Klauss v. Commissioner, T.C. Memo. 2000-191; sec. 25.2512-2(f)(2), Gift Tax Regs. Such other relevant factors include the company's goodwill and management, the company's position in the industry, the economic outlook in the particular industry, the degree of control in the company represented by the shares subject to valuation, and the available values of securities in companies engaged in a similar business. See id.

In the instant cases, as in most cases involving valuation disputes, the parties primarily relied on opinions by experts to establish the value of the transferred blocks of stock. Petitioners presented the appraisal report of Gary L. Wahlgren (Mr. Wahlgren) to establish the prediscount value of the stock in the Company and the amount of discounts for lack of control (minority interest) and lack of marketability. Respondent relies on an appraisal report prepared by Phillip J. Schneider (Mr. Schneider).

The discount for a minority interest accounts for the inability of a shareholder to control or influence decisions in a closely held corporation. See Ward v. Commissioner, 87 T.C. 78, 106 (1986); Estate of Stevens v. Commissioner, T.C. Memo. 2000-53. The discount for lack of marketability, on the other hand, is used to compensate for the fact that there is no ready market

for shares in a closely held corporation. See Estate of Stevens v. Commissioner, supra. Because the inability to control a closely held corporation influences the marketability of the investment, there is sometimes some overlap between the two discounts. See Estate of Andrews v. Commissioner, supra at 952.

We have wide discretion in accepting expert testimony. See Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938). We examine the expert's qualifications and compare his or her testimony with all other credible evidence in the record. We may accept or reject an expert's opinion entirely or pick and choose the portions of the opinion we find reliable. See id.; Seagate Tech., Inc., & Consol. Subs. v. Commissioner, 102 T.C. 149, 186 (1994); Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990); Parker v. Commissioner, 86 T.C. 547, 562 (1986).

At trial, Mr. Schneider accepted Mr. Wahlgren's conclusion that the fair market value of the Company stock on a minority basis, but before consideration of the discount for lack of marketability, was $46.24 per share at the time of transfer.[2] From that figure, Mr. Wahlgren opined that a 65.77-percent marketability discount was appropriate,[3] while Mr. Schneider

---

[2]  Mr. Schneider, in his report, failed to account for interest and principal recovered from loans previously charged off on the books of the Bank.

[3]  References to marketability discount are to the discount for lack of marketability.

believed that only a 20-percent discount should be applicable.[4]
We must decide whether a discount for lack of marketability is
appropriate, and, if so, to what extent.

Mr. Wahlgren's Report

To evaluate Mr. Wahlgren's methodology for computing the
marketability discount, we first review his computation of the
value of the Company stock on a minority basis.  Before making
any fair market value determinations, Mr. Wahlgren evaluated the
assets, liabilities, and stockholders' equity amounts listed on
the Company's and the Bank's books.  After reviewing the
historical book values of the assets and liabilities of the Bank,
Mr. Wahlgren increased the asset amounts primarily for loans
previously charged off (from which interest and principal were
subsequently being recovered) and increased liabilities for
deferred taxes associated with the increased amount in assets.
The Bank's balance sheet was therefore adjusted as follows:

| Balance Sheet Items | Hist. BV | Adjustment | Adjusted BV |
|---|---|---|---|
| Assets | $23,953,000 | $2,397,000 | $26,350,000 |
| Liabilities | 19,436,000 | 815,000 | 20,251,000 |
| Stockholders' equity | 4,517,000 | 1,582,000 | 6,099,000 |

---

[4]  Mr. Whalgren's valuation for each of petitioners'
separate transfers results in an amount of $108,436 (($46.24 per
share x .3423) x 6,850 shares).  This value is significantly
lower than the $145,357 value (per transfer) reported by
petitioners on their gift tax returns.  A taxpayer who asserts a
valuation lower than the one reported on a tax return must
provide cogent proof that the reported valuation was erroneous.
See Estate of Hall v. Commissioner, 92 T.C. 312, 337-338 (1989).

Next, Mr. Wahlgren correspondingly adjusted the historical book value of the Company assets. He especially concentrated on the value of the Company's 94.6-percent interest in the Bank, which he computed on the basis of the adjusted book value of the stockholders' equity in the Bank. The adjustments to the assets, liabilities, and stockholders' equity amounts on the Company's books are described below:

| Balance Sheet Items | Hist. BV | Adjustment | Adjusted BV |
|---|---|---|---|
| Assets | $4,612,582 | $1,502,081 | $6,114,663 |
| Liabilities | 9,850 | 2,534 | 12,384 |
| Stockholders' equity | 4,602,732 | 1,499,547 | 6,102,279 |

After making adjustments to both the Company's and the Bank's books, Mr. Wahlgren decided to establish the fair market value of the Company on a net asset value basis. Because the Company's primary asset consisted of the 94.6-percent ownership interest in the Bank (and there were minimal liabilities), Mr. Wahlgren derived the value of the Company by primarily considering the Bank's independent fair market value.

In order to arrive at the fair market value of the Bank, Mr. Wahlgren evaluated five factors which he had previously relied on to compare privately owned Nebraska banks sold within 12 months before or after November 1992: (1) Bank size, (2) market served, (3) historical growth of deposits, (4) loan portfolio quality, and (5) profitability. After considering the above factors (in terms of the adjusted book values of the Bank) and using the

sales of the privately owned Nebraska banks as a comparison, Mr. Wahlgren arrived at a fair market value of $6,708,900 for the Bank. Mr. Wahlgren established the fair market value of the Bank at 1.49 times greater than the historical book value of the stockholders' equity and at 1.10 times greater than the adjusted book value of the stockholders' equity.

Having derived the fair market value of the Bank, Mr. Wahlgren proceeded to compute the fair market value of the Company on a net asset value basis. After substituting the fair market value of the 94.6-percent interest in the Bank ($6,346,619) for the adjusted book value of the 94.6-percent interest in the Bank ($5,769,654) on the Company's books and subtracting the liabilities from the value of all the Company assets, Mr. Wahlgren arrived at a $6,679,244 fair market value for the Company.[5] As there were 130,000 shares of stock outstanding, Mr. Wahlgren established that each share was worth $51.38 before considering any discounts. Mr. Wahlgren applied a 10-percent minority discount, which reduced the value of each share to $46.24.

Mr. Wahlgren then applied a 65.77-percent discount for lack of marketability using the Quantitative Marketability Discount Model (the QMDM model) proposed by Z. Christopher Mercer in his

---

[5] The Company had other minor assets besides the 94.6-percent interest in the Bank. For example, on its books, the Company listed approximately $290,000 in marketable securities and $40,000 in notes receivable.

book Quantifying Marketability Discounts (1997), to arrive at a valuation of $108,436 for each of petitioners' separate transfers. According to Mr. Mercer, an appraiser using the QMDM model is able to quantify the impact of the factors that influence marketability discounts in real-life settings. See id. at 209.

As described by Mr. Mercer, an appraiser first values the shareholder's investment at the entity level, resulting in a valuation of the investment as if it were marketable. See id. at 171-184. In his book, Mr. Mercer generally arrives at the entity level valuation using the capitalization of earnings method, which considers current earnings per share, an anticipated earnings growth, and an appropriate discount rate accounting for the inherent risk with regard to investing in a particular company. See id. The net amount of the discount rate less the anticipated earnings growth is referred to as the capitalization rate, which is multiplied against the earnings per share. See id. After that computation is made, the appraiser has generated the marketable value of 1 share in the investment. See id. Mr. Mercer then suggests that the appraiser adjust the value of the stock upward for a control premium or downward for a minority interest. See id.

After the value of the marketable investment at the entity level is computed, the appraiser applies the QMDM model to account for the fact that the growth in the value of the

investment (along with any dividends distributed) does not meet the shareholder's required rate of return for a specified period. See id. at 212-215. Mr. Mercer advises that the required rate of return should reflect the "investor's required rate of return, or the opportunity cost of investing in the subject company versus another, similar investment that has immediate market liquidity." Id. at 214.

In the instant cases, Mr. Wahlgren applied a 9.12-percent growth rate, a zero-percent distribution yield, a holding period of 10 years, and a required holding period return of 21.47 percent. Mr. Wahlgren determined that the Company's growth rate depended on the increasing value of the Bank, the Company's primary asset. Mr. Wahlgren, in turn, computed the growth rate for the value of the Bank using the average return on equity between 1988 and 1992 (13.54 percent) of the Bank. Because the average return on equity was based on the historical book values of the Bank, Mr. Wahlgren reduced the average return by dividing it by a factor of 1.4853 to account for the difference between the estimated fair market value and historical book value of the Bank as of December 31, 1992.[6]

With regard to the dividend yield, Mr. Wahlgren concluded that the Company did not have a history of making distributions

---

[6] Mr. Wahlgren rounded the 1.4853 factor to 1.49 when discussing the ratio between the fair market value of the Bank to the historical book value of the stockholders' equity in the Bank. See supra p. 9.

and therefore assigned a zero percent.  As for the holding period, Mr. Wahlgren opined that neither the Company nor the Bank would be sold within 10 years because Mr. Janda wanted to continue to operate the Bank for as long as possible and, in any event, Robert Janda wanted to manage the bank thereafter.  With regard to the holding period return of 21.47 percent, Mr. Wahlgren considered the risk-free yield on U.S. Treasury bonds, the difference between long-term yields on common stock over intermediate U.S. Government bonds, and a small stock premium.

Respondent challenges Mr. Wahlgren's use of the QMDM model on the basis that there is no evidence that appraisal professionals generally view the QMDM model as an acceptable method for computing marketability discounts.  Respondent also asserts that the data used by Mr. Wahlgren in the QMDM model is inaccurate.

We recognized in Estate of Weinberg v. Commissioner, T.C. Memo. 2000-51, that "slight variations in the assumptions used in the [QMDM] model produce dramatic difference in results."  The effectiveness of this model therefore depends on the reliability of the data input into the model.

We have serious reservations with regard to the assumptions made by Mr. Wahlgren.  For example, we are concerned whether in determining the growth rate of the Company, it was proper for Mr. Wahlgren to simply average the Bank's historical returns on equity for the 5 years prior to December 31, 1992, and then

adjust the average return by a factor dependent on the difference between historical book value and the fair market value of the Bank as of December 31, 1992. Mr. Mercer also indicates in his book that the required holding period return should be adjusted for shareholder-specific risks related to the nonmarketability features of the investment, such as:

(1) Indeterminacy of the holding period;

(2) likelihood of interim cash-flows;

(3) prospects for liquidity;

(4) uncertainty of favorable exit;

(5) general unattractiveness of the investment; and

(6) restrictive agreements.

See Mercer, supra at 250-251.

Mr. Wahlgren has failed to make any such analysis. As applied by Mr. Wahlgren, the economic model at best adjusts the fair market value of the Company for the fact that an investor will not receive the required higher rate of return (demanded for investments in small capitalized companies) for a period of 10 years. Mr. Wahlgren, however, has not added any increments to the holding period return for the risk elements associated with the specific circumstances of this situation.

We find Mr. Wahlgren's application of the QMDM model in the instant cases not to be helpful in our determination of the marketability discount. We have grave doubts about the reliability of the QMDM model to produce reasonable discounts,

given the generated discount of over 65 percent.

Mr. Schneider's Report

Mr. Schneider accepted Mr. Wahlgren's marketable-minority value of the Company stock because he became aware at trial that the Company had other assets not reflected on its books.  He, however, maintained that the transferred blocks of stock should be entitled to only a 20-percent discount for lack of marketability.  In his report, Mr. Schneider identified the following factors as affecting marketability discounts:

1.    The asset type held
2.    The time horizon until liquidation
3.    Distribution of cash-flow
4.    Earned cash-flow (after debt service)
5.    Information availability
6.    Transfer costs and/or requirements
7.    Liquidity factors:

    a.    Is the company large enough to be public?
    b.    Is there a pool of potentially interested buyers?
    c.    Is there a right of first refusal?

Mr. Schneider then listed various studies made on marketability discounts which are cited by Shannon Pratt in his book Valuing a Business:  The Analysis and Appraisal of Closely-Held Companies (2d ed. 1989).  The studies, which deal with marketability discounts in the context of restricted, unregistered securities subsequently available in public equity markets, demonstrate mean discounts ranging from 23 percent to 45 percent.  Mr. Schneider also cited several U.S. Tax Court cases that established marketability discounts ranging from 26 percent to 35 percent. Finally, Mr. Schneider stated in his report that he had consulted

a study prepared by Melanie Earles and Edward Miliam which asserted that marketability discounts allowed by the Court over the past 36 years averaged 24 percent.

Before arriving at his conclusion, Mr. Schneider remarked that he believed that "a bank would be a highly marketable business and that the stock would be highly marketable." He also noted in his report that the Company did not have a sole shareholder owning more than 50 percent of the Company. At trial, Mr. Schneider testified that the Company was marketable because the Bank had strong profitability. Evaluating these characteristics in conjunction with marketability discounts arrived at in the studies discussed by Shannon Pratt and allowed by this Court in its prior opinions, Mr. Schneider concluded that a 20-percent discount for lack of marketability was appropriate.

As for Mr. Schneider's report, we believe that he merely made a subjective judgment as to the marketability discount without considering appropriate comparisons. Mr. Schneider looked at only generalized studies which did not differentiate marketability discounts for particular industries. Further, although he stated that each case should be evaluated in terms of its own facts and circumstances, Mr. Schneider seems to rely on opinions by this Court that describe different factual scenarios from the instant cases and generalized statistics regarding marketability discounts previously allowed by the Court. Finally, Mr. Schneider has failed to fully explain why he

believes that bank stocks are more marketable than other types of stock. We therefore are unable to accept his recommendation.

The Court's Valuation

We recognize that the Company is a small bank holding entity operating only one bank in a rural Nebraska community. The Company has limited growth opportunities because the Bank has a small defined market. Furthermore, the Company is capitalized with common stock not publicly traded and not easily sold privately.

We believe that a hypothetical seller and purchaser of the common stock would take into account that any subsequent sale of the common stock would require a private sale by the owner of the stock, a public offering by the Company, or a complete acquisition of the Company. Any of those three options could take an extended time period and involve significant transaction costs. Furthermore, we also believe that most of the concerns regarding lack of marketability relate to the lack of control associated with any transferred block of stock. Accordingly, we apply a discount of 40 percent both for lack of control and marketability to the prediscount fair market value of the Company stock as determined by petitioners' expert. We therefore hold that on the date of the transfers, the value of each transferred block of stock was $211,186.[7]

We have considered all of the arguments raised by the

---

[7] ($51.38 per share x .60) x 6,850 shares.

parties, including numerous criticisms of each expert's report, and find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.